[L.A. No. 29733. In Bank. May 10, 1971.]

HARVEY B. HIMMEL, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Harvey B. Himmel, in pro. per., and Gerald G. Wolfson for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that petitioner be suspended from the practice of law for one year on conditions of probation including three months' actual suspension.[1]

Petitioner, who was admitted to practice in 1952, was charged in a notice to show cause with forging the name of a client, Gloria Bowers, to a check, commingling her funds with his own, converting her funds, and knowingly making a false representation to her. An answer filed by petitioner denied the charges.

### The Evidence

Gloria Bowers (who was then Gloria Murray) met petitioner around 1956. She subsequently saw him socially on various occasions, and he handled a domestic relations matter for her in 1957. Following an automobile accident in 1959 she retained him to represent her in an action for damages against Donald Howe. Petitioner filed a complaint in the Los Angeles Superior Court, and on August 12, 1963, a judgment was rendered in her favor for $5,885.46, of which her net share was $2,951.69. The day the trial ended she returned to her home in San Jose. Subsequently, on August 29, 1963, petitioner received in satisfaction of the judgment a $5,885.46 check payable to him and Mrs. Bowers. He endorsed, or caused to be endorsed, her name on the check and deposited it in a trust account. On the same day he withdrew $6,000 from the account and loaned the money to Clarion of North America, a corporation of which he was president and its attorney and in which he had a one-third interest. Had he not deposited the check in the account, the account would have been overdrawn over $5,000 by the withdrawal. Clarion, which was engaged in an import-export business, was formed in early 1963 and ceased to operate in 1966.

Petitioner admittedly did not have *written* authority to endorse Mrs. Bowers' name on the check or to invest her funds in Clarion. The evidence is in sharp conflict, however, as to whether she *orally* authorized him to do those acts. The evidence is also conflicting as to whether he subsequently made certain misrepresentations to her and her husband and as to several other matters.

Mrs. Bowers testified: She never told petitioner he could endorse her

---

[1]Five of the thirteen board members voted against the recommendation; three of the five believed that the proceeding should be dismissed. The local committee (three members) made a recommendation of three years' suspension, which recommendation apparently was based in part upon a matter that was dismissed by the board.

name on the check, nor did she authorize him to invest her funds, although she did ask his advice as to how to invest them. About a month or two after the trial she telephoned petitioner and asked if the money had arrived, and he replied "No, it hasn't." She told petitioner that she and her husband needed $300 for moving expenses, and petitioner stated that "they were taking [her case] to a higher court, I think he said on appeal, or something like that."

Following the conversation Mrs. Bowers received from petitioner in October 1963 a $300 check drawn on a trust account of petitioner. The check bore the notation "On acct settlement proceeds Murray v. Howe" and was accompanied by a letter stating that the $300 check represents "partial payment of your net recovery proceeds."[2]

In November 1963 Mr. Bowers wrote petitioner asking whether the judgment proceeds had been received and stating that the Bowers had found a home they wanted to make a payment on. He did not receive any reply.

Mrs. Bowers testified: In January 1964 by telephone she asked petitioner's secretary if there was "anything new on my settlement," and the secretary replied "not that she knew of." Mrs. Bowers inquired whether petitioner could "advance" her enough money to make a down payment on a car. The secretary replied she would contact petitioner, and she subsequently told Mrs. Bowers that "He says it's all right to advance you the money. . . ."

Shortly thereafter Mrs. Bowers received a $350 check drawn on a trust account of petitioner. The check bore the notation *"advance* on Murray vs. Howe Settlement payment on account." (Italics added.)

Mr. Bowers testified that in December 1964, after receiving a letter indicating a warrant for his arrest had been issued in connection with back child support payments, he telephoned petitioner and asked if there was a possibility of using Mrs. Bowers' settlement to make the back payments and that petitioner replied her case was "on appeal." Later, however, when asked whether petitioner ever told him personally that the case had been appealed, he replied "I can't say for sure." He further testified that during a subsequent telephone conversation he told petitioner of his intent to leave the state and that petitioner told him to keep in touch "so that when the money came in [petitioner] could send it to [them]."

The Bowers moved to Texas about December 1964 and returned to California in late July or early August 1965. Mrs. Bowers testified that she did not remember whether they had contacted petitioner while they were

---

[2]Miss Eileen Kendall, petitioner's secretary, testified that she wrote and signed the check and letter, and also a $350 check hereinafter mentioned.

in Texas, that during that period she had a miscarriage and was ill, and that they "left the state on advice not to let it be known where we were" apparently because of the warrant for her husband's arrest.

Mrs. Bowers stated that it was upon her return to California that she first learned petitioner had received the money. According to the testimony of the Bowers, shortly after their return to California they visited petitioner at his office and inquired whether the settlement had arrived; he replied that it had and that, since he had not known where they were, he had invested the money in real estate at 7 percent interest on a 30-day call. They said they wanted the money, and petitioner said it would take about 30 days to get it.

Petitioner did not deliver the money within 30 days but instead made payments to Mrs. Bowers as follows: September 10, 1965, a $50 check; September 22, 1965, a $250 check; October 8, 1965, a $1,000 check; October 13, 1965, a $1,000 check; March 18, 1966, a $227.14 check.[3] The checks were drawn on several trust accounts he maintained. None of the checks showed that the funds had been loaned to Clarion. The final payment was made after petitioner knew that Mrs. Bowers had filed a complaint with the State Bar.

Mrs. Bowers testified that shortly after receiving the $50 check she phoned petitioner and told him she needed more money. She thereafter received the $250 check together with a letter from petitioner stating "Haven't yet received the payoff—but am enclosing another 'Partial pay' on the account to help you . . . out . . . ." According to Mrs. Bowers, she subsequently tried to call petitioner various times at his office but his secretary always said he was not in, and Mrs. Bowers received a $1,000 check after her mother, Mrs. Shell, phoned petitioner. Mrs. Shell testified that in the telephone conversation she informed petitioner that she had consulted her lawyer and that he had advised going to the State Bar. She said it was shortly after the conversation that Mrs. Bowers received the first $1,000 check.

Accompanying that check was a note by petitioner stating "Herewith

---

[3]The $227.14 check bore on the reverse side the notation "In full and final payment of all claims & share of proceeds, In re Murray v. Howe, including interest in full on invested funds, as per accounting of this date." After receiving the check, Mrs. Bowers wrote petitioner questioning his accounting and stating that she would accept the check only as a partial payment and that unless she heard from him she would presume he was in agreement. Ensuing correspondence between petitioner and Mrs. Bowers reflected a dispute as to his claimed authority to deduct certain charges relating to Mr. Bowers. One of her letters requested a further payment of $211.80 and stated "I am sending a copy of this letter to the State Bar . . . and trust that it will be unnecessary to again utilize their services in order to obtain what is rightfully mine." She, however, eventually endorsed the check.

$1,000 on your investment. Eileen [his secretary] has gone—so full statement of account & balance of money will be forthcoming this next week—as promised . . . ." Although petitioner sent the second $1,000 check the following week, he did not include any "full statement of account" as he had promised.

Several months later, in March 1966, he transmitted to Mrs. Bowers a "Statement of Loan Investment Account" and "Statement of Accounting." Neither document showed to whom the funds had been loaned or with whom they had been invested.

Mrs. Bowers also testified that shortly before the State Bar preliminary hearing in March 1966 petitioner telephoned her and offered her more money if she would withdraw her complaint.

Petitioner's version of the facts was as follows: Mrs. Bowers gave him oral permission to sign her name and told him not to send the check to her home in San Jose because (1) her husband had problems with his ex-wife regarding child support and Mrs. Bowers did not want the recovery used for that purpose or her husband to know she had the money and (2) the Bowers had tentative plans to move to the Los Angeles area in the next month or so. Petitioner discussed various possible investments with Mrs. Bowers, she asked him to invest her money in Clarion, and he orally guaranteed the loan.[4] He conceded that neither he nor anyone on behalf of Clarion executed a promissory note in her favor and that such notes were given certain other persons who loaned money to Clarion.

Testimony by petitioner's wife, who was present during part of the conversations between petitioner and Mrs. Bowers, tended to corroborate his testimony regarding his oral authority to sign her name and invest her funds in Clarion, although some of her testimony indicated uncertainty as to what was said. Her testimony also corroborated her husband's that Mrs. Bowers did not want Mr. Bowers to know of the check.

Petitioner denied having told Mrs. Bowers that her case was being appealed or taken to a higher court. He stated that he told her during a telephone conversation in September 1963 that the money had arrived the prior month and had been loaned to Clarion but was payable on demand. According to petitioner, he inquired whether she wanted any of the money, and she replied that she did not but that she would probably want some of

---

[4]Petitioner further testified that he did not recall a signed written guarantee, that he was sure he must have understood at the time of his oral guarantee that as a general proposition a guarantee is not enforceable unless it is signed and in writing, but that he "didn't really think about that."

it later. The following month she requested $300 for moving expenses, and he sent her the money.

Petitioner further testified: On one occasion Mr. Bowers referred to the money from his wife's lawsuit as a possible source for back child support, and he told Mr. Bowers to talk to Mrs. Bowers. He never told Mr. Bowers the money was not available and did not tell him anything about Mrs. Bowers' affairs at her request.

Petitioner also denied having told the Bowers following their return from Texas that the money was invested in real estate and stated that he told them "you know it's invested . . . Clarion has had a rough time . . . I'll have the money for you in about 30 days out of Clarion collections or another matter." When asked why in the letter accompanying the $250 check he used the term "payoff" and not "Clarion payoff," he replied that "in hindsight this was handled 'wrecklessly' and 'carelessly' " but that he thought she understood the situation as a result of their prior conversation.

Petitioner further testified that the first $1,000 check was sent before his conversation with Mrs. Shell and that Mrs. Shell made no reference to the fact that there was going to be a complaint before the State Bar. He stated that he had returned Mrs. Bowers' calls, and testimony by his secretary corroborated this statement. Petitioner also testified that before the State Bar preliminary hearing he had a telephone conversation with Mrs. Bowers but his version of the conversation, contrary to hers, did not include any offer to pay her more money if she would drop the proceeding.

Miss Sharon Walters, a temporary secretary for petitioner, testified: In September 1963 in a telephone conversation she told Mrs. Bowers that the "judgment check" had been received, a portion disbursed for fees, and the balance invested for her in Clarion, and Mrs. Bowers replied, "Fine." Extended questioning by the State Bar examiner and the committee revealed her inability to recall various matters, such as whether petitioner's office was to the right or left of the reception room and the names of any persons whom she talked to during the last week of August or first week of September 1963 in addition to Mrs. Bowers and two specified persons.

Miss Eileen Kendall, petitioner's regular secretary, testified: Upon her return from vacation in early September 1963, petitioner instructed her to prepare an accounting of the expenses and recovery in Mrs. Bowers' case, and Miss Kendall prepared the accounting and gave it to petitioner. About the same time petitioner told her that he had had "a discussion with Mrs. Bowers about investing her money in Clarion" and that the recovery was invested in Clarion. Miss Kendall prepared and maintained two ledger sheets, one relating to Mrs. Bowers' recovery and another for her loan to

Clarion. [Both ledger sheets were introduced, and both expressly referred to Clarion.] The ledger sheets were kept at petitioner's office and were available for inspection at any time by Mrs. Bowers if she had asked to see them.

Petitioner testified that Mrs. Bowers' loan was also shown on Clarion's books. A ledger sheet, which was identified as Clarion's[5] and received in evidence, contained the entry "G. M. Bowers @ 7%" and the figure "$2,366.57."[6] Payment and computation of interest were not reflected thereon, and other Clarion ledger sheets specifically referring to Mrs. Bowers were not introduced. Petitioner testified that many Clarion records were found missing when its general manager left in 1966.

### The Findings

The board and local committee found in substance that petitioner, without authority from Mrs. Bowers and knowing he lacked such authority, signed or caused to be signed her name on the check received in satisfaction of the judgment; converted "all of the funds resulting from the judgment" by loaning the money to Clarion without her consent; falsely represented to her that her case was on appeal and that the funds had not yet been received; intentionally concealed from her the receipt of the funds until August 1965; falsely represented to the Bowers the type of investment he had made; and commingled the funds of Mrs. Bowers and others in various trust accounts, using those accounts as his own personal accounts.[7] Detailed findings were made by the board and local committee relating to the foregoing matters, including the finding that "full restitution of the funds due to [Mrs. Bowers] by [petitioner] was not made until after a complaint had been lodged by [her] with the State Bar . . . and [petitioner] became aware of the investigation by the State Bar . . . ."

### Whether Evidence Supports the Findings

■■ Findings by the local committee and the Disciplinary Board are not binding on this court, and we will weigh the evidence and pass upon its sufficiency. ■ All reasonable doubts will be resolved in favor of the

---

[5]Petitioner testified that the sheet was Clarion's, and Miss Walters testified she had seen the entry when she worked at Clarion although she was not the one who posted the figures.

[6]Petitioner testified the amount apparently represented the sum owed to Mrs. Bowers after the first two payments.

[7]The above false representations were not alleged in the notice to show cause. However, petitioner does not complain of the matter. Furthermore, at the hearing he proceeded as if all the facts surrounding the transaction relating to Mrs. Bowers were in issue, and under the circumstances he could not now complain that the notice to show cause was not amended. (Cf. *Crooks* v. *State Bar,* 3 Cal.3d 346, 357 [90 Cal. Rptr. 600, 475 P.2d 872].)

accused and if equally reasonable inferences may be drawn from a proven fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. (*Reznik* v. *State Bar,* 1 Cal.3d 198, 201-202 [81 Cal.Rptr. 769, 460 P.2d 969]; *Ashe* v. *State Bar,* 71 Cal.2d 123, 133 [77 Cal.Rptr. 233, 453 P.2d 737]; *Zitny* v. *State Bar,* 64 Cal.2d 787, 789-790 [51 Cal.Rptr. 825, 415 P.2d 521]; *Bodisco* v. *State Bar,* 58 Cal.2d 495, 497 [24 Cal.Rptr. 835, 374 P.2d 803].)

■ The findings, however, must be given great weight, and "When the findings . . . rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. [Citations.]" (*Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 790; in accord, *Lee* v. *State Bar,* 2 Cal.3d 927, 940 [88 Cal.Rptr. 361, 472 P.2d 449]; *Bernstein* v. *Committee of Bar Examiners,* 69 Cal.2d 90, 101-102 [70 Cal.Rptr. 106, 443 P.2d 570].) ■ The burden is on the petitioner to show that the findings are not supported by the evidence or that the recommendation is erroneous. (*Reznik* v. *State Bar, supra,* 1 Cal.3d 198, 201-202; *Ashe* v. *State Bar, supra,* 71 Cal.2d 123, 133; *In re Clark,* 63 Cal.2d 610, 612 [47 Cal.Rptr. 681, 407 P.2d 993, 18 A.L.R.3d 1403].) In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty. (*Reznik* v. *State Bar, supra; Ashe* v. *State Bar, supra; Zitny* v. *State Bar, supra.*)

Petitioner claims that the evidence does not support the finding that he was unauthorized to sign Mrs. Bowers' name on the check. He asserts that his testimony that she gave him "express authority to sign the check is corroborated by the testimony of three other witnesses as well as by the subsequent conduct of the parties and by the documentary evidence." However, two of the witnesses in question (petitioner's secretaries) were not present when Mrs. Bowers assertedly granted such authority; the evidence of the subsequent conduct of the parties, as we have seen, is largely conflicting; and the documentary evidence does not establish that Mrs. Bowers authorized him to sign her name. Although testimony by petitioner's wife tended to corroborate his testimony that he was expressly authorized to endorse the check, her testimony reflected some uncertainty in this regard, and it is significant that the local committee rejected the testimony of petitioner and his wife and accepted that of Mrs. Bowers.

Petitioner argues that Mrs. Bowers' testimony should not be accepted. He seizes upon the fact that when asked by a committee member whether she authorized petitioner to sign her name on the check she replied, "Not that I recall," and he asserts that this suggests she may have given such

authority but does not now recall it. She had previously testified, however, that she did not authorize petitioner to sign her name on the check, and the quoted response does not render it unreasonable to conclude from her testimony that she did not authorize petitioner to endorse the check. Petitioner also points to testimony by her that she could not remember certain matters (e.g., whether petitioner discussed with her the possibility of keeping any recovered funds in Los Angeles so that Mr. Bowers' ex-wife could not reach them, whether she communicated with petitioner while she was in Texas, and whether she told the State Bar not to proceed with the instant matter), but such testimony likewise does not require us to reject the finding that she did not authorize petitioner to endorse the check.

Petitioner further suggests that Mrs. Bowers' testimony that she never knew until August 1965 that the judgment had been paid is false, and he asserts that, if so, her testimony as to whether he was authorized to sign her name on the check is "similarly tainted." In support of the position that she knew before August 1965 that the judgment had been paid he points to the following: (1) the notations on the $300 and $350 checks and the letter accompanying the $300 check;[8] (2) a portion of Mrs. Bowers' testimony in which she admitted that when she received the first check she understood she was being paid part of the judgment; and (3) testimony of petitioner and Miss Walters that in September 1963 Mrs. Bowers was told by them that the money had been received.

It is clear, however, from Mrs. Bowers' testimony, when read in its entirety, that she thought the $300 and $350 checks were advances (out of some sort of fund petitioner had) on the money that had been awarded to her but that had not yet been paid[9] and that the notations on those checks

---

[8] As we have seen, the $300 check bore the notation "On acct settlement proceeds Murray vs. Howe"; the notation on the $350 check was "advance on Murray vs. Howe Settlement payment on account"; and the letter stated that the $300 check represents "partial payment of your net recovery proceeds."

[9] The following examination of Mrs. Bowers is illustrative of her testimony on the subject:

After she testified on cross-examination that she recalled receiving the $300 check and the accompanying letter, she was asked by petitioner's counsel:

"Q. And the 'partial payment of your net recovery proceeds' to you meant a portion of the results of the accident case, did it not?

"A. I presume so, yes, that's what I understood it was money that he was advancing me from the money that we would get.

"Q. . . . . Now, that $300 was a portion of the amount of the recovery in the litigation that had been completed in August, was it not?

[An objection was made and overruled.]

"A. Well, as I said as I understand from the letter and as I did then it was an advance on the money that I was to get from the court trial when they sent the money.

"Q. This was a partial payment of the $5,800, is that what you understood?

"A. Yes.

and the letter accompanying the $300 check did not convey to her knowledge that the judgment had been paid. Indeed the phrase *"advance* on Murray vs. Howe settlement" (italics added) in the notation on the $350 check could well have indicated to her that the judgment remained unpaid.

The local committee's extended examination of Miss Walters suggests that the committee did not credit her with an adequate independent recollection of the asserted conversation in which she told Mrs. Bowers of the receipt of the money, and the local committee also rejected petitioner's testimony that Mrs. Bowers had been so informed.

Petitioner argues, without citation of any authority, that in view of specified evidence if he did not have express authority to sign Mrs. Bowers' name on the check, he had implied authority to do so. However, even if it were assumed that he had such authority, it would include only the authority to endorse the check for her benefit and not the authority to endorse it for his own benefit, i.e., to enable him to misappropriate the proceeds of the check (see Rest., Agency, §§ 39, 76, com. (c); Mecham on Agency (2d ed.) p. 702; 2 C.J.S., Agency, § 112, subd. b, subsec. (1)(c)), and, as hereinafter discussed, the evidence supports the finding that he misappropriated her portion of the proceeds.

With respect to the finding that petitioner converted "all of the funds resulting from the judgment" by loaning the money to Clarion without

---

"Q. That was your understanding what the check represented?
"A. Yes, it is part of the money that I was awarded.
"Q. You understood that when you got the check and cashed it?
"A. Yes."
Mrs. Bowers was subsequently questioned by a committee member as follows:
"Q. On what basis did you assume that [petitioner] would lend you money?
"A. Well, because when we called him . . . shortly after the . . . trial and told him our problem and asked him if he could help, he sent the $300, and at the time as an advance, so after that I just every time I needed money . . . this was my last resort, I would call to see if anything had happened, and try and talk him into another advance.
"[Committee member]: When you first asked him for an advance and he indicated the matter was going to a higher court was there any discussion what would happen if the higher court reversed the verdict so there was no money coming to you, any discussion how you would repay it?
"A. Every time I talked to him he said he was sure we would get it, it was a matter of time. He was very positive the money would come."
Later a committee member asked whether when she received the $350 check she believed it was a loan by petitioner from his own funds, and she replied "Well, the only thing I understood was that it was money that would come from my settlement when the money came in. I don't know where the funds came from." The committee member again asked whether she thought it was a loan to her of petitioner's own funds and she replied, "I guess so." Later on recross she stated that she did not think petitioner was giving her his own money when he sent the checks to her, that she "thought that lawyers had funds set aside for such things as this . . . and this was just coming out of this fund. I really didn't understand."

Mrs. Bowers' consent, petitioner states that the finding is erroneous because (1) part of the funds belonged to him for his fees and reimbursement of costs and (2) there is not satisfactory proof he converted the balance. However, it obviously is implicit in the finding that the quoted phrase refers to Mrs. Bowers' share of the judgment, and the previously recited evidence constitutes adequate proof of conversion. His failure to provide her with any written documentation of Clarion's obligation to her and the absence of any specific reference to Clarion on all the documents furnished her are suspicious circumstances. Although it appears that she was identified as a Clarion creditor on ledgers of petitioner and Clarion and his secretary testified that Mrs. Bowers could have inspected petitioner's ledgers had she asked, it would seem unlikely that she would make such a request and from her testimony it appears she would have had no reason to ask to see Clarion's books. The local committee was in a better position than this court to resolve the conflicting testimony as to whether Mrs. Bowers orally authorized petitioner to invest her funds in Clarion. He admittedly did not have written authority in this regard.

In attacking the finding that he falsely represented to Mrs. Bowers that her case was on appeal and the funds had not yet been received, petitioner asserts that his making the $300 and $350 payments to Mrs. Bowers is inconsistent with any such representation—that had he made such a representation he would not have made partial payments of the recovery. However, the making of such payments is not necessarily inconsistent with the representation. He may have desired to keep Mrs. Bowers comparatively satisfied so that she would not be inclined to investigate further the status of her case. Petitioner also claims that the words hereinafter italicized rendered Mrs. Bowers' testimony so vague and unreliable it cannot support the finding that he represented that the case was on appeal. Mrs. Bowers testified that petitioner told her that "they [the losing side] were taking it to a higher court, I *think* he said on appeal or *something like that.*" (Italics added.) The italicized words, however, do not render her testimony insufficient proof of the fact that he made the representation in question.

Petitioner claims that Mrs. Bowers' testimony is too uncertain to support the finding that he represented to her that "he had invested [her] money for her with a man and a woman in real estate at 7% interest on a thirty-day call." However, Mr. Bowers also testified regarding the representation, and the Bowers' combined testimony fully supports the finding.

With respect to the finding that "full restitution of the funds due to [Mrs. Bowers] by [petitioner] was not made until after a complaint had been

lodged by [her] with the State Bar . . . , and [petitioner] became aware of the investigation by the State Bar . . . ," petitioner states that the finding is "true as far as it goes" but that before the complaint was made the principal had been repaid in full to Mrs. Bowers, together with part of the interest, and that the only portion still then unpaid was $227.14 interest. He points to his testimony that his failure to send the $227.14 balance to Mrs. Bowers sooner was an oversight "due to things that had happened in 1965 and early 1966," that he had been under stress caused by Clarion's failure, that his family experienced losses around $200,000 or more as a result of that failure, and that he had been having problems with Clarion's general manager. The fact remains, however, that full repayment was not made until he knew of the complaint.

Petitioner asserts that the finding that he commingled the funds of Mrs. Bowers "and others" in various trust accounts and used those accounts as his own personal accounts is unsupported by the evidence. Whether or not the evidence supports that finding, the recommended discipline, as we shall see, is amply warranted.

*Discipline*

Petitioner contends that if, contrary to his position, the findings are upheld the discipline recommended is too severe. He asserts that specified matters (e.g., lower legal fee charged Mrs. Bowers than that recommended by local bar association and "generous rate of interest" on the loan of her funds to Clarion) show that he acted fairly in his dealings with her. However, even if the specified matters are correct, it is manifest from the findings heretofore stated that he did not act fairly in those dealings.

Petitioner further notes that Mrs. Bowers did not suffer any financial loss and that during his 18 years of practice this is the first time discipline has been recommended. The foregoing factors are in his favor. (See *Yapp* v. *State Bar,* 62 Cal.2d 809, 818 [44 Cal.Rptr. 593, 402 P.2d 361].)

However, as shown above, he committed acts of serious misconduct (signing or causing to be signed client's name on check knowing he lacked authority to do so, misappropriation of her funds, and making misrepresentations). This court has declared that "The misappropriation of a client's funds, in the absence of clearly extenuating circumstances, warrants disbarment. (*In re Freiburghouse,* 52 Cal.2d 514, 516 . . . .)" (*Simmons* v. *State Bar,* 70 Cal.2d 361, 366 [74 Cal.Rptr. 915, 450 P.2d 291].) *Simmons,* however, further stated that in that case there were "no clearly extenuating circumstances" and nevertheless did not disbar the attorney but suspended him for four years on conditions of probation including two years actual suspension. There the attorney misappropriated a client's funds, failed to

observe rule 9 of the Rules of Professional Conduct regarding the handling of trust funds, demonstrated a "complete lack of candor" in his testimony, and had a prior disciplinary record for misappropriation of a client's funds.

*Flaherty* v. *State Bar,* 16 Cal.2d 483 [106 P.2d 617], followed a recommendation of one-year suspension where there was a conversion of funds, coupled with misrepresentations, and the attorney had a prior disciplinary record. *Di Gaeta* v. *State Bar,* 59 Cal.2d 116 [28 Cal.Rptr. 305, 378 P.2d 577], followed a recommendation of six months' suspension on condition of probation including three months actual suspension where the attorney converted funds.

*Yapp* v. *State Bar, supra,* 62 Cal.2d 809, suspended the attorney for three years on conditions of probation including actual suspension for 90 days where the attorney misappropriated trust funds and made misrepresentations but there were extenuating circumstances (e.g., no prior disciplinary record and no one was injured).

As noted in *Yapp* v. *State Bar, supra,* 62 Cal.2d 809, 819, "there is no conformity as to punishment ascertainable from the cases. Each case must be decided on its own facts." ■ On the facts of this case the recommended discipline (one year suspension on conditions of probation including three months actual suspension)[10] seems fair and even lenient.

It is ordered that petitioner be suspended from the practice of law for one year but that execution of the order be stayed and that he be placed on probation for one year upon conditions prescribed by the Disciplinary Board in this matter, including actual suspension for the first three months, the order to be effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied June 9, 1971.

---

[10]The other conditions of probation included compliance with the State Bar Act and Rules of Professional Conduct and the filing of certain reports with the State Bar certifying to specified matters.