[L.A. No. 32270. Aug. 20, 1987.]

JAMES ELLIS SCHNEIDER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Greines, Martin, Stein & Richland and Alan G. Martin for Petitioner.

Herbert M. Rosenthal and Truitt A. Richey, Jr., for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review the recommendation of the State Bar that petitioner, James Ellis Schneider, be suspended from the practice of law for a period of three years, that execution of the suspension be stayed, and that he be placed upon probation for three years. The recommended conditions of probation include two years' actual suspension.[1] The hearing panel's recommendation was similar, but included no actual suspension.

---

[1] The recommended conditions of petitioner's probation also prohibit petitioner from serving as a trustee for any trust during the period of probation. In addition, petitioner must file quarterly reports with the State Bar Court, in which he shall certify that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California. For each period in which petitioner possesses client funds, his quarterly report also must contain a certificate from a certified public accountant or a public accountant certifying that he has maintained permanent accounting records distinguishing clients' funds and expenditures from his own, that he has maintained a "trust account" or a "client's funds account" at an in-state branch of a bank authorized to do business in California, that he has maintained a permanent record of all trust account transactions with monthly listings and balances for each client, and that he has maintained a permanent record showing all specifically identified property held in trust for clients. Petitioner also must maintain a current address with the State Bar Court, cooperate fully with a probation monitor referee, promptly answer all inquiries from the State Bar regarding compliance with the terms of probation, pass the Professional Responsibility Examination, and comply with rule 955 of the California Rules of Court.

## I.

Petitioner was admitted to the practice of law in the State of California on January 4, 1967, and has no prior discipline. The present allegations arose out of petitioner's management of trust funds, largely in 1981, while serving as trustee for two trusts that he had drafted.

A settlement conference was held in which the State Bar examiner and petitioner's counsel fully presented the facts and the evidence of mitigation to the settlement referee, J. Sterling Hutcheson, a prominent San Diego attorney. The referee announced what his disciplinary recommendation would be, and, several months later, the parties stipulated as to the facts and mitigation, waived any variance between the notice to show cause and the stipulation or the subsequent hearing panel decision, and agreed that the matter could be decided by Mr. Hutcheson, serving as a one-member hearing panel. Petitioner also stipulated that he violated his fiduciary duties to his clients and the trust in one of the incidents. The parties did not stipulate as to discipline.

The panel incorporated the stipulation in its findings and decided that petitioner had willfully violated rule 5-101 of the Rules of Professional Conduct (hereafter rule 5-101)[2] and committed an act of dishonesty (Bus. & Prof. Code, § 6106).[3] After the panel recommended the discipline it had earlier announced, a sharply divided review department, on its own motion, set the matter for hearing. After two hearings, the matter was submitted, the review department adopted the panel's findings but modified two of them, added a finding that petitioner had violated his oath and duties as an attorney (§§ 6067 and 6068), and, by a divided vote,[4] recommended the more severe discipline.

## II.

The stipulated facts disclose two separate incidents of professional misconduct—the Kornberg and the Meetze matters.

[2] Rule 5-101 states: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

[3] Unless otherwise indicated, all section references are to the Business and Professions Code.

[4] Of the eleven referees participating in the decision, eight voted yes and three voted no, one on the ground that the period of actual suspension recommended is excessive, and two on the ground that it is insufficient.

In the Kornberg matter, petitioner drafted a trust for Dr. Richard Kornberg and Mrs. Edith Kornberg in January 1978 for the benefit of their children. The trust instrument permitted the trustee (petitioner) to borrow money from the trust or lend money from the trust to any person, provided the loan was adequately secured and bore a reasonable rate of interest. Although the trust agreement required the trustee to obtain prior authorization from the trustors before investing funds of the trust, no prior approval was required for borrowing from the trust.

Petitioner received in excess of $10,000 on behalf of the trust from the Kornbergs. Without notifying the Kornbergs, petitioner withdrew $7,500 from the trust on July 9, 1981, and withdrew the remaining balance of $3,546.72 on July 14, 1981.[5] In withdrawing the money, petitioner did not provide security to the trust, did not disclose in writing to the trustors the terms of the transactions, did not give them an opportunity to seek independent counsel, and did not receive their written consent. Petitioner would have testified that he acted in a manner implicitly approved by the Kornbergs, and that his conduct was consistent with his past dealings with them.

In January 1982, Mrs. Kornberg inquired about the funds. Petitioner said he would pay them back to a successor trustee. In March 1982, petitioner filed for bankruptcy. However, he did repay the funds borrowed from the trust. The Kornbergs requested the District Attorney of San Diego County to bring criminal charges against petitioner, but he declined to do so because the evidence was insufficient to prove beyond a reasonable doubt that the transactions were fraudulent misappropriations rather than loans permitted by the trust agreement.

In the Meetze matter, petitioner was retained by James Meetze in June 1977 to draft a trust and serve as trustee. Petitioner received in excess of $58,000 on behalf of the trust. The trust agreement authorized the trustee to lend trust money, provided there was adequate security and the loan bore a reasonable rate of interest. The trustee also had the power to borrow from the trust.[6] The trustee was permitted to make investments in his discretion, provided he gave 10 days' advance notice to the trustor of any investment

---

[5] Petitioner testified before the review board that this money was lent to Albacore II, a tuna boat partnership in which petitioner had a one-third interest. Petitioner testified the trust was to receive 18 percent interest, and the loan was secured by petitioner's "business judgment that my partner, who was a very substantial person in San Diego, was basically behind the loan as much as I was." There are no documents evidencing the loans.

[6] It is not clear whether the trust agreement was intended to require the trustee to provide adequate security and interest for funds he borrowed from the trust. The agreement provided: "[n]otwithstanding anything to the contrary herein, the Trustor [Trustee ?] shall not have . . . the power to borrow the principal or income of the trust estate, directly or indirectly, without adequate interest or without adequate security."

involving $5,000 or more. If the trustor objected in writing within 10 days, the trustee could not make the investment.

Between December 24, 1980, and April 16, 1981, petitioner, without notifying the trustor, withdrew $58,000 from the trust in seven payments, five of which were greater than $5,000. In August 1981, Mr. Meetze, independent of petitioner, learned the $58,000 was no longer in the trust's bank account and asked petitioner where it was. Petitioner told him the money was invested in a certificate of deposit, but failed to tell him that the certificate was used as collateral for a loan to Keating Properties Ltd. (Keating), a partnership in which petitioner was a general partner.[7] In September 1981, petitioner gave Mr. Meetze documentation showing a $56,000 note secured with a 50 percent interest in a Keating entity and a $2,000 note. The collateral securing both notes was in excess of $200,000.

Petitioner thought the Keating investment was a good one and believed he had the implicit approval of Mr. Meetze. Petitioner did not inform Mr. Meetze of the investment, obtain his authorization, or give him a reasonable opportunity to seek the advice of independent counsel. Petitioner conceded that he breached his fiduciary duty to Mr. Meetze by failing to obtain Mr. Meetze's fully informed authorization before investing the funds and by failing to disclose to Mr. Meetze that the certificate of deposit, which was surrendered to a bank, had been pledged as collateral.

In January 1982, Mr. Meetze filed a civil suit against petitioner. The suit was settled in April 1982, after Meetze was repaid.[8]

As to mitigation, the stipulation provides that petitioner has no prior record of discipline; that he has held a number of civic and professional positions of responsibility, including chairman of the San Diego County Bar taxation section; that he was in extreme financial difficulty in the early 1980's and was forced into bankruptcy because of financial reversals related to problems of the San Diego business community; that he believed his investment of the Kornberg funds in a tuna boat and the Meetze funds in a real estate venture in San Diego's Gaslamp District were sound and profitable ventures; that since 1982 he has revived his practice and reaffirmed numerous dischargeable debts and continues to make monthly payments on them; that he freely admits wrongdoing, is contrite, and has expressed extreme remorse over the difficulties caused to the complaining

---

[7] Petitioner testified before the review department that he had a 15 to 20 percent interest in Keating and that there were two other significant investors.

[8] Petitioner testified before the review department that Mr. Meetze received $30,000 plus 20 percent interest in October 1981; the remaining $28,000 was due in December 1981 but was not paid until March 1982.

parties; and that he has admitted that he failed to comply with his fiduciary duties as a trustee for the Kornberg and Meetze trusts and as an attorney.

At the first hearing before the review department, the bar examiner argued in favor of the hearing panel's decision. "[The] facts were openly discussed, the books are opened, and . . . there were full discussions and detailed questions, and the matter, in essence, was tried without any real rules of evidence so that everything was opened. [¶] There was a mishandling of funds. There was not a finding of misappropriation, and funds have been paid back and there is a great deal of mitigation." Petitioner testified that the transactions in both matters were "basically loans to investments that I was related to" and that he had viewed the transactions as fully secure. His attorney, Mr. McGrath, explained that the parties entered the stipulation partly to avoid an expensive trial on whether the transactions were loans from the trusts to investments or investments by the trusts. The matter was submitted.

The review department vacated the submission and scheduled the matter for further argument on whether the certificate of deposit into which the Meetze trust funds were placed was a trust asset and, if so, whether the use of the certificate as collateral for a loan without consideration was a misappropriation of the certificate. At the second hearing, petitioner appeared without counsel and reiterated that both transactions were loans, not investments. He also complained of the unfairness of the review department accepting the factual stipulation and rejecting the hearing panel's recommendation for more lenient discipline. He suggested that if the review department disagreed with the referee's recommendation, it should set aside the stipulation and remand for further proceedings before the hearing panel.[9]

The review department questioned petitioner about the Meetze transactions. He stated that on March 9, 1981, he executed a line-of-credit note for $56,000 in favor of the trust, and on April 15, 1981, he executed a second note for $2,000. The notes were secured by an assignment of a Keating property, but petitioner did not perfect the security.[10]

The review department's findings reflect this testimony. The review department also found that petitioner "falsely stated [to Mr. Meetze] that the

[9] The referee had estimated it would cost petitioner $50,000 for a full hearing.

[10] The review department augmented the record to include two promissory notes showing that the loans bore an interest rate of 20 percent. The review department also admitted into evidence a "Partnership Assignment" dated March 9, 1981, wherein Keating pledged its 50 percent interest in a partnership called 818 5th Avenue Associates as collateral for the $56,000 promissory note. Of course, these documents were executed long after the December 24, 1980, loan of $4,000.

funds had been invested in a certificate of deposit. It was not until September 8, 1981, that [petitioner] informed Mr. Meetze that the proceeds of the loan had been invested by the Trust in [Keating]."[11] The review department further found that petitioner violated his oath and duties as an attorney as prescribed by sections 6067-6068. Its reason for recommending greater discipline than that recommended by the hearing panel was that "the record shows that . . . [petitioner] committed an egregious breach of trust in two matters aggravated by his attempt to conceal his misconduct from the trustors."

### III.

Petitioner first contends he was denied due process when the review department refused to relieve him of a stipulation that was based on his understanding that he would suffer no actual suspension. He claims he is entitled to relief from all effects of the stipulation and, if this court is inclined to impose any discipline more severe than that recommended by the hearing panel, he should be given an opportunity to contest the charges against him in a full trial.

The Rules of Procedure of the State Bar explicitly encourage the use of stipulations dispensing with proof or with facts not in dispute. (Rule 401.) Such stipulations bind the parties unless the hearing panel, for good cause, rejects, or relieves the parties from, such binding effect. (*Ibid.*)

Although the hearing panel did not relieve the parties of the stipulation in this case, petitioner claims he is entitled to relief under rule 408(b) of the Rules of Procedure of the State Bar. That rule provides that where the referee, hearing panel, or review department rejects a stipulation as to facts and discipline, "the parties shall be relieved of all effects of the stipulation and the proceeding or investigation shall resume." Petitioner argues "[t]here was no essential difference between the stipulation in this case and a stipulation as to facts and disposition and there is no reason why a basic due process distinction should be made to turn on such hair-splitting differentiation as occurred here."

We disagree. Petitioner is an experienced attorney and was represented by counsel in the proceedings that led to the stipulation. He is charged with knowledge of the possibility of stipulating to discipline as well as facts. Presumably, if the parties had intended to stipulate to discipline they would have done so. Here, however, the record clearly shows the examiner did not

---

[11] Actually, the loan proceeds were invested with other funds in a $250,000 certificate of deposit which was subsequently pledged as collateral to a banker.

intend to stipulate as to discipline. The examiner testified before the review department that although he understood what the hearing panel's disciplinary recommendation would be, the stipulation "was not a stipulation as to facts and discipline. I didn't want to enter into that."

Even if rule 408(b) were to apply to factual stipulations that are motivated by a hearing panel's announced disciplinary recommendation, petitioner would not be entitled to relief. Rule 408(b) applies only where a stipulation is rejected. The review department in this case did not reject the stipulation. Rather, it accepted most of the hearing panel's findings, which were based on the stipulation, and merely modified them to reflect petitioner's testimony before the review department. (See Rules Proc. of State Bar, rule 452.) A rejection of the hearing panel's disciplinary recommendation is not a rejection of a stipulation within the meaning of rule 408(b), if the stipulation does not specify discipline.

We think petitioner received exactly what he bargained for in the stipulation: a recommendation by the hearing panel that he be given no actual suspension. ■■■ Petitioner is bound by the stipulation as to the facts, and if we deem it necessary to impose harsher punishment than that recommended by the hearing panel he is not entitled to an evidentiary hearing on the stipulated facts. (See *Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 471-472 [169 Cal.Rptr. 581, 619 P.2d 1005].) By parity of reasoning, petitioner also is bound to the waiver of variance contained in the stipulation.

■■■ The stipulation, however, also contains legal conclusions. As noted above, petitioner stipulated that the Meetze transaction was an "investment," requiring notice to the trustor under the trust agreement, and that he violated his fiduciary duties to both the Kornbergs and Mr. Meetze and their trusts. Under the circumstances of this case, we believe petitioner should not be bound by these legal conclusions.

■■■ In *Inniss* v. *State Bar* (1978) 20 Cal.3d 552, 555 [143 Cal.Rptr. 408, 573 P.2d 852], a case involving a stipulation as to facts and discipline, we stated the general rule that an "attorney should become bound by the factual recitals in a stipulation once the board has entered its findings, conclusions, and recommendations." We concluded, however, that where this court is considering imposition of more severe sanctions than those recommended, "fundamental fairness seems to require us to relieve an attorney from the *legal conclusions* to which he may have agreed solely because the recommended punishment seemed to him fair and reasonable." (Italics in original; see *Wells* v. *State Bar* (1984) 36 Cal.3d 199, 207 [203 Cal.Rptr. 134, 680 P.2d 1093]; *Finch* v. *State Bar* (1981) 28 Cal.3d 659, 662

[170 Cal.Rptr. 629, 621 P.2d 253]; *Giovanazzi* v. *State Bar, supra,* 28 Cal.3d at p. 470.)

■ In this case, the review department held a second hearing to reassess the legal conclusions to which petitioner stipulated. Petitioner was questioned at length about whether the transactions were loans or investments. The review department reopened this issue, accepted additional documentary evidence, requested detailed explanations over petitioner's objection to the fairness of the procedure, and altered the stipulated facts to reflect the new evidence. Under these rather unique circumstances, it would be fundamentally unfair to bind petitioner to the legal conclusions contained in his stipulation. In reviewing the review department's findings of misconduct, we therefore disregard petitioner's admissions that he breached his fiduciary duty and that the Meetze transaction was an investment.

■ Petitioner next contests the review department's findings that he willfully violated the disclosure, advice, and consent requirements of rule 5-101 and that he violated his oath and duties as an attorney under sections 6067 and 6068.[12] He maintains that these findings are legally erroneous and not supported by the evidence.

■ Petitioner, of course, bears the burden of showing that the findings of the review department are not supported by the evidence or that the recommendation is erroneous or unlawful. (§ 6083, subd. (c); *Trousil* v. *State Bar* (1985) 38 Cal.3d 337, 341 [211 Cal.Rptr. 525, 695 P.2d 1066].) "In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty." (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993].) In passing on the sufficiency of the evidence, we conduct an independent review of the record, resolving all reasonable doubts in favor of the attorney. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11 [206 Cal.Rptr. 373, 686 P.2d 1177]; *Prantil* v. *State Bar* (1979) 23 Cal.3d 243, 246 [152 Cal.Rptr. 351, 589 P.2d 859].)

■ Petitioner maintains that transactions permitted by the trust instrument itself do not fall within the scope of rule 5-101. He argues that to require compliance with rule 5-101 notwithstanding the authority conferred by the trust threatens to substantially defeat the trustor's purpose and cause

---

[12] Petitioner does not appear to dispute the finding that he committed an act involving dishonesty within the meaning of section 6106. Although petitioner suggests that the statute's emphasis on acts involving moral turpitude, dishonesty, and corruption might require more than a misstatement which is not part of a dishonest course of conduct, he admits that the treatment of a misrepresentation as an act of dishonesty under this section is well engrained. The finding is supported by evidence of petitioner's misleading statements to Mr. Meetze.

delays that could unnecessarily interfere with opportunities for profitable employment of trust funds.

Petitioner relies on *Copley* v. *Copley* (1981) 126 Cal.App.3d 248, 279 [178 Cal.Rptr. 842]. There, the Court of Appeal held, as a general rule, that the duty of loyalty imposed on a trustee (Civ. Code, § 2228) and the statutory prohibitions against self-dealing by a trustee (Civ. Code, §§ 2229 & 2231) must give way to directions contained in the governing trust instrument. Rule 5-101, however, imposes quite independent requirements on attorneys who transact business with clients. The mere fact that such a transaction arises in the context of a trust agreement does not exempt an attorney from the rule. The terms of the trusts authorizing self-dealing on the part of petitioner clearly come within the rule and do not supersede it.[13]

Petitioner asserts in the alternative that the agreements themselves satisfy rule 5-101: the trusts were in writing, they gave petitioner broad discretion to manage the trusts, and the clients had at least three years within which to consult other counsel and modify the trusts. The review department made no findings on this issue. We observe, however, that petitioner admitted to the review department that he did not think that he had explained to the trustors that the trust agreements, as he interpreted them, would permit him to loan money to himself or to entities with which he was connected. Furthermore, petitioner offered no evidence that he had advised his clients to seek independent counsel. (*Ritter* v. *State Bar* (1985) 40 Cal.3d 595, 602 [221 Cal.Rptr. 134, 709 P.2d 1303].) Even if they had done so, however, the Kornbergs at least could not have modified the trust since it was irrevocable.

We conclude that petitioner has not shown that he satisfied rule 5-101 by his conduct prior to the transactions in question. We therefore turn to the question of whether the record supports the review department's finding that petitioner violated rule 5-101 through his conduct as trustee.

The record contains clear and convincing evidence that petitioner breached his fiduciary duty to manage the trust funds for the benefit of the

---

[13]Petitioner also argues that rule 5-101 is analogous to Civil Code section 2235, which creates a presumption of undue influence for transactions between a trustee and a beneficiary by which the trustee obtains any advantage from the beneficiary. Petitioner contends that because the undue influence presumption does not apply to agreements relating to the hiring and compensation of the trustee (e.g., *Walton* v. *Broglio* (1975) 52 Cal.App.3d 400, 404 [125 Cal.Rptr. 123] [fee agreement]), the rule 5-101 requirements should not apply to transactions arising out of trust instruments which establish the relationship between a trustor and an attorney serving as a trustee. The analogy is inapt. There is no evidence that the term giving petitioner broad management powers was intended to compensate him. Moreover, the exception under Civil Code section 2235 is contained in the statute itself; there is no analogous exception in rule 5-101.

trust beneficiaries in accordance with the terms of the trusts. Petitioner failed to provide security for the loan from the Kornberg trust, as required by the trust instrument, and he misled Mr. Meetze in telling him that his trust funds were invested in a certificate of deposit. An attorney who so abuses the broad management powers conferred upon him by a trust agreement cannot rely on the term specifying those powers to avoid rule 5-101. To hold otherwise would invite mischief and undermine the rule. Petitioner violated rule 5-101 by failing to fully disclose the terms of the transactions to his clients, by failing to give them an opportunity to seek independent counsel after advising them to do so, and by failing to obtain their written consent to the transactions.[14]

A violation of the Rules of Professional Conduct will merit discipline only if the breach is willful. (§ 6077; *Leoni* v. *State Bar* (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) Petitioner asserts there is no convincing evidence that any violation of rule 5-101 was willful. Petitioner contends the evidence shows that he believed he was acting with the approval of the trustors and in a manner which would (and did) benefit the trusts.

We disagree. Although there is conflicting evidence on this issue, the lack of documentation of the loan from the Kornberg trust to the Albacore II partnership, petitioner's misleading response to Mr. Meetze's inquiry about the whereabouts of his trust funds, and petitioner's delay in rectifying his misrepresentation amply support the review department's finding of willfulness. (See *Alberton* v. *State Bar, supra,* 37 Cal.3d at p. 12; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82].)

Petitioner next contends that the review department's finding that he violated his oath and duties as an attorney as prescribed by sections 6067-6068 is without sufficient legal or factual basis. He maintains that his misrepresentation to Mr. Meetze, his failure to provide security for the loan from the Kornberg trust, and his arguable violation of the notice and advance approval provisions governing "investments" of funds from the Meetze trust cannot automatically be considered a violation of his oath and duties.

Although it may be possible in some cases for an attorney to violate rule 5-101 or certain provisions of the Business and Professions Code without violating his oath and duties as an attorney, this is not such a case. Petitioner's dishonest statement to Mr. Meetze and his willful breach of rule 5-101

---

[14] Having found a clear violation of rule 5-101, we need not decide whether the Meetze transactions were investments rather than loans.

were violations of his oath "to discharge the duties of any attorney at law to the best of his knowledge and ability." (§ 6067.)

We therefore conclude that the review department's findings of misconduct must be sustained.

██ Petitioner's final contention is that the degree of discipline recommended by the review department is excessive. We agree.

██ " ' "The purpose of a disciplinary proceeding is not punitive but to inquire into the fitness of the attorney to continue in that capacity for the protection of the public, the courts, and the legal profession." ' " (*Chasteen* v. *State Bar* (1985) 40 Cal.3d 586, 591 [220 Cal.Rptr. 842, 709 P.2d 861]; *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) This court exercises its independent judgment in determining the appropriate discipline for professional misconduct. (*Franklin* v. *State Bar* (1986) 41 Cal.3d 700, 708 [224 Cal.Rptr. 738, 715 P.2d 699]; *Waysman* v. *State Bar* (1986) 41 Cal.3d 452, 456 [224 Cal.Rptr. 101, 714 P.2d 1239].) In arriving at a proper discipline, we must balance all relevant factors, including mitigating circumstances, on a case-by-case basis. (See *Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186]; *Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 919 [101 Cal.Rptr. 369, 495 P.2d 1289].) We attach great weight to the disciplinary recommendation of the review department (*Martin* v. *State Bar* (1978) 20 Cal.3d 717, 723 [144 Cal.Rptr. 214, 575 P.2d 757]), and less weight to that of the hearing panel (*Rimel* v. *State Bar* (1983) 34 Cal.3d 128, 131 [192 Cal.Rptr. 866, 665 P.2d 956]).

██ Petitioner's misconduct was serious, and his mishandling of trust funds was aggravated by his intentional misrepresentation to Mr. Meetze. But the misconduct does not appear to have been as egregious as the review department found it was. The review department did not find that petitioner had misappropriated his clients' funds, and the evidence could not support such a finding. The "loans" appear to have been within the scope of the trusts. The Meetze loans were adequately secured, although the security was not perfected, and the Kornberg loans did not appear to be at risk, although they were not secured. We do not consider the misconduct so egregious as to warrant two years' actual suspension, even in the absence of some of the mitigation present in this case.

As acknowledged by the bar examiner himself, "there is a great deal of mitigation." The absence of a prior disciplinary record is an important mitigating circumstance (*Chefsky* v. *State Bar, supra,* 36 Cal.3d at p. 132, fn. 10), particularly in a case such as this where petitioner was a member of

the bar for approximately 13 years before the events leading to these proceedings. (*Waysman* v. *State Bar, supra,* 41 Cal.3d 452, 457.)

Petitioner's service to the community also is a mitigating factor. (See *In re Mudge* (1982) 33 Cal.3d 152 [187 Cal.Rptr. 779, 654 P.2d 1307]; *In re Arnoff* (1978) 22 Cal.3d 740, 747 [150 Cal.Rptr. 479, 586 P.2d 960]; *Codiga* v. *State Bar, supra,* 20 Cal.3d at p. 796; *In re Jones* (1971) 5 Cal.3d 390, 401 [96 Cal.Rptr. 448 [487 P.2d 1016].) Petitioner, a certified specialist in taxation, was a member of the State Bar taxation section executive committee, and chaired its educational committee. He also chaired the taxation section of the San Diego County Bar Association and founded the San Diego Tax Practitioners group and the San Diego Pension Council. He has been an active member of the chancellor's associates of San Diego School of Law, where he is an adjunct professor of law in tax accounting. Attorneys, clients, and a judge have submitted letters on his behalf, and the San Diego Gaslamp Quarter Council has commended him for a "Decade of Friendship." Petitioner's services to the profession and the community are a factor in mitigation entitled to considerable weight.

We also are not insensitive to the personal and professional problems that besieged petitioner during the period in question. (*Tenner* v. *State Bar* (1980) 28 Cal.3d 202, 207 [168 Cal.Rptr. 333, 617 P.2d 486]; *Bradpiece* v. *State Bar, supra,* 10 Cal.3d at p. 747.) In 1980, petitioner became very involved in San Diego's downtown redevelopment, particularly the protection and rehabilitation of historical buildings and a live theater. By doing so, he overextended himself, and his practice suffered for it. During 1981 and 1982, he had to cope with the illness and eventual death of his father. At about the same time, in early 1982, petitioner became bankrupt and lost his practice.

Despite petitioner's personal bankruptcy, he restored the trust funds with interest before the notice to show cause was issued (see *Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47]; *Athearn* v. *State Bar* (1977) 20 Cal.3d 232, 237 [142 Cal.Rptr. 171, 571 P.2d 628]) and notwithstanding the fact that the Meetze loan was made directly to a partnership in which there were other general partners. He also reaffirmed three substantial obligations amounting to over $160,000.

Petitioner's professional career since his troubled period in 1981 to 1982 further demonstrates his fitness to practice law. In the relatively short period since his bankruptcy in March 1982, petitioner has rebuilt his practice. Beginning in May 1982, he worked as tax counsel to a law firm at a modest salary. By July 1984, he had founded his own firm again. He employs several attorneys and support personnel. His work has included serv-

ing as general counsel to a newly formed savings and loan holding company and as lead counsel for major tax litigation involving 82 partnerships with over 2,400 partners.

In sum, the record shows that petitioner's transgressions were confined to a relatively short period. His conduct before and since has been beyond reproach. Typical is his conduct in these disciplinary proceedings, also a factor in mitigation. (*Bradpiece* v. *State Bar, supra,* 10 Cal.3d 742, 748; *Waysman* v. *State Bar, supra,* 41 Cal.3d 452, 458.) Petitioner has been candid, cooperative, and contrite. He has expressed a willingness to accept a lengthy period of probation under the rigorous conditions recommended by the hearing panel.

A survey of the cases reveals that the review department's recommendation is grossly excessive. It is disproportionate to the offenses and gives the considerable mitigating factors insufficient weight. As recently as *Ritter* v. *State Bar, supra,* 40 Cal.3d 595, 604, footnote 9, we observed that "Rule 5-101-type violations have resulted in a wide range of discipline," including private reproval. There, the attorney convinced the client to loan him the proceeds of a settlement without an opportunity for independent advice. The loan was unsecured. We reduced the discipline recommended by the review department to one year's suspension, stayed execution, and ordered a two-year probation and sixty days actual suspension. In more severe cases, where the attorney did not merely mishandle funds, but misappropriated them and lied and had a prior disciplinary record, this court has ordered much less actual suspension than the two years recommended by the review department in this case. (See *Chasteen* v. *State Bar, supra,* 40 Cal.3d 586 [multiple offenses, including neglect of a case leading to dismissal, commingling, misappropriation, lying to a client, and misconduct over a six-year period: sixty days actual suspension]; *Rossman* v. *State Bar, supra,* 39 Cal.3d 539 [neglect leading to loss to conservatee's estate, illegal fee, deceit of probate court: three months actual suspension]; *Palomo* v. *State Bar* (1984) 36 Cal.3d 785 [205 Cal.Rptr. 834, 685 P.2d 1185] [endorsing client's name on settlement check without authorization, commingling, misappropriation: no actual suspension]; *Tenner* v. *State Bar, supra,* 28 Cal.3d 202 [over a period of years, forged client signatures, misappropriated money, lied to clients and to the State Bar: no actual suspension].) Of all the cases involving misappropriation or conversion of a client's funds, only the most serious ones have merited one year or more actual suspension. (See *Bradpiece* v. *State Bar, supra,* 10 Cal.3d 742 [one year]; *Mack* v. *State Bar* (1970) 2 Cal.3d 440 [85 Cal.Rptr. 625, 467 P.2d 225] [ two years]; *Simmons* v. *State Bar* (1969) 70 Cal.2d 361 [74 Cal.Rptr. 915, 450 P.2d 291] [two years].)

Petitioner has rebuilt his practice and earned the confidence and respect of the legal community and the San Diego community at large. A long period of actual suspension in this case is inconsistent with the purpose of discipline: to protect the public, preserve confidence in the profession, and maintain high professional standards.[15] It also would cause unnecessary hardship to petitioner's family and employees, as well as to his creditors. We believe the public will be adequately protected by the three-year probationary period and a short period of actual suspension. (See *In re Chira* (1986) 42 Cal.3d 904, 908 [231 Cal.Rptr. 560, 727 P.2d 753].)

Accordingly, we order that petitioner be suspended from the practice of law for three years, that the execution of such suspension be stayed, and that petitioner be placed on probation subject to the conditions recommended by the review department, except that during the first 30 days of the period of probation petitioner shall be suspended from the practice of law. In addition, petitioner shall be required to pass the Professional Responsibility Examination within one year from the effective date of this court's order. Petitioner shall not be required to comply with rule 955 of the California Rules of Court. This order shall become effective on August 27, 1987.

---

[15] Petitioner also argues that the review department's recommendation is inconsistent with the Standards for Attorney Sanctions for Professional Misconduct that were adopted on November 22, 1985. One purpose of the standards is "to achieve greater consistency in disciplinary sanction for similar offenses." Under standard 2.8, suspension is warranted for willful violations of rule 5-101 "unless the extent of the member's misconduct and the harm to the client are minimal." Here, the misconduct was substantial and Mr. Meetze was not repaid until he filed a civil suit. Although the violation merits suspension, the standard does not require actual suspension. Standard 2.3, covering, inter alia, acts of intentional dishonesty or of concealment toward a client, requires actual suspension or disbarment, depending on the extent of the harm, the magnitude of the conduct, and the degree the misconduct relates to the member's acts within the practice of law. Under this standard, some actual suspension would be required. Although the hearing panel decision was filed on October 18, 1985, two and one-half months before the January 1, 1986, effective date of the standards, we find it appropriate to consider the standards in an effort to promote consistency in discipline.