# IN THE SUPREME COURT OF CALIFORNIA

In re DREXEL BRADSHAW on Discipline.

S282314

---

July 3, 2025

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

—————————————————————————————————————-

In re BRADSHAW

S282314


Opinion of the Court by Liu, J.


In 2018, the Hearing Department of the State Bar Court found attorney and respondent Drexel Andrew Bradshaw (Bradshaw) culpable of three counts of misconduct: engaging in a scheme to defraud (Bus. & Prof. Code, § 6106), breach of fiduciary duty (*id.*, § 6068, subd. (a)), and three willful and intentional misrepresentations (*id.*, § 6106). (All undesignated statutory references are to the Business and Professions Code.) The disciplinary action brought by the State Bar's Office of Chief Trial Counsel (OCTC) stemmed from Bradshaw's conduct as successor trustee of the Gosey Revocable Living Trust (Gosey Trust or Trust). The hearing judge recommended disbarment. Separately, in civil court probate proceedings, Bradshaw was removed as trustee of the Gosey Trust. The Review Department of the State Bar Court concluded that although Bradshaw was grossly negligent in making three misrepresentations, Bradshaw's culpability as to the charged misconduct was not supported by clear and convincing evidence. The Review Department recommended a six-month suspension and two years of probation. One member of the Review Department disagreed and would have recommended disbarment.

Based on an independent review of the record, we find Bradshaw culpable of multiple counts of misconduct involving moral turpitude and conclude that disbarment is necessary to protect the public and the integrity of the legal profession.

## I.

We begin by recounting the history of the Gosey Trust and then discuss the manner in which Bradshaw channeled Trust funds to a company he created. The Hearing Department, as well as the superior court and Court of Appeal in a contemporaneous probate proceeding, found that Bradshaw breached his fiduciary duties as trustee, acted in bad faith, and engaged in a multi-year scheme to defraud the Trust, among other misconduct. The Review Department, with one judge dissenting, rejected the factual and legal conclusions of the Hearing Department. We granted the OCTC's petition for review.

## A.

Bradshaw first represented Ora Gosey in a landlord-tenant dispute in 2006. Gosey, then 78 years old, requested that Bradshaw's law firm, Bradshaw & Associates, P.C., prepare an estate plan, including the drafting of her will and the Gosey Trust. The Trust was established (1) "[t]o provide for the care and maintenance" of Gosey in her lifetime, (2) "[t]o facilitate management of the trust property in the event of [her] incapacity," and (3) "[t]o facilitate transfer of the trust property" upon her death. The Trust estate consisted primarily of Gosey's home in San Francisco, which included a rental unit.

Gosey had no children or spouse at the time of drafting; her former partner Thomas Bush, her longtime friend Willie Cole, and Bradshaw's law firm were designated, respectively, as first, second, and third successor trustee upon her disability or death. The terms of the Trust instrument permitted the trustee to "[e]mploy the Trustee, a relative of the Trustee, or a business in which the Trustee has an interest, to perform needed services

for the Trust or any business in which the Trust has an interest and pay compensation not exceeding fair market value" so long as the trustee did not "act in bad faith or in disregard of the purposes of the Trust." Except as expressly provided otherwise in the Trust instrument, the trustee had "the duties imposed by law" and was required to wield the power of trustee as "a prudent person" would. Gosey expressed a strong preference to remain in her home if she were to become incapacitated. Her will authorized the trustee to "expend as much of the Trust estate as necessary to avoid placing [her] in an assisted living community, home for the elderly, or the like," and to "apply or expend all or a part of the income and principal of said Trust, or both, for [her] comfort, health and maintenance in [her] accustomed manner of living."

After drafting these documents, Bradshaw did not have contact with Gosey until she fell in her home in August 2013. Gosey's tenants contacted Adult Protective Services (APS) because Gosey refused to eat or drink, but Gosey declined APS's assistance. Shortly thereafter, Gosey was hospitalized, and her doctors determined she was unable to care for herself or her estate due to dementia. She subsequently returned to her home with the assistance of in-home care. After Bush and Cole declined to serve as successor trustee, Bradshaw's attorney Sheila Robello petitioned the probate court to appoint Bradshaw as Gosey's temporary and permanent conservator. In describing Gosey's "obvious lack of means to care for herself," Bradshaw's petition — signed under penalty of perjury — stated that Gosey had been removed from her home by APS. Bradshaw was appointed as Gosey's temporary conservator and temporary trustee of Gosey's estate on September 11, 2013, and as permanent conservator in November 2013. He petitioned the

probate court to waive court accounting pursuant to Probate Code section 2628 and to terminate its supervision over the Gosey Trust in order to avoid "additional expense" to Trust assets. The probate court declined both requests.

**B.**

We now describe the origins and operations of the company to which Bradshaw channeled substantial payments from the Gosey Trust.

In November 2013, around the time Bradshaw became Gosey's conservator, Bradshaw hired Juan Gonzalez to fix flooding damage from a burst pipe in Gosey's home and rental unit. Gonzalez had previously performed small construction and repair jobs for Bradshaw and was doing business as NJ Construction. Gonzalez did not have a contractor's license. Bradshaw then hired NJ Construction for small repairs at Gosey's home between November 2013 and June 2014. During that time, Bradshaw and Gonzalez entered into an agreement whereby Bradshaw would assist Gonzalez in obtaining his contractor's license. Bradshaw paid $1,000 for Gonzalez to attend a licensing course. In April 2014, Bradshaw's law firm prepared and filed with the California Secretary of State the incorporation documents for a company named Bay Construction, Inc. (Bay Construction). Bradshaw was the sole signatory on Bay Construction's Articles of Incorporation, and he listed himself as the initial agent for service of process and his law firm address as the corporate address.

After the Contractors State License Board (CSLB) denied Gonzalez's first and second license applications, Bradshaw engaged a construction consulting firm for advice on obtaining a license for Bay Construction. The firm recommended that Bay Construction hire a Responsible Managing Officer (RMO) in

order to qualify for a contractor's license. (See §§ 7068 [an RMO under the statute must be permanently employed and actively engaging in the operations of the applicant's contracting business for at least 32 hours or 80 percent of the total hours per week that the business is in operation], 7068.1 [an RMO must engage in direct supervision and control of the work performed by the applicant contracting business].) Bradshaw then hired Raymond Invernon, a licensed contractor, to serve as an RMO supervising the work of Bay Construction.

Invernon was in his 70s and lived in Idaho most of the time. Neither Gonzalez nor Bradshaw's son Colin Grey Bradshaw (Grey), who worked for Bay Construction with Gonzalez on repairs for Gosey's home, ever met or spoke with Invernon. Grey testified that he had never heard of Invernon. Claire Lewis, Gosey's tenant, did not recall seeing Invernon on the property. During the OCTC's investigation into Bradshaw, Invernon said he assumed no work had been done under Bay Construction's license because Bradshaw never called him about any project. Carlos Marquez, a CSLB supervisor, testified that if the CSLB had been aware that Invernon was renting his license to Bay Construction and not actually supervising its work, the CSLB would not have approved Bay Construction's application. Nancy Rasch, an attorney appointed by the probate court to investigate Bradshaw's affiliation with Bay Construction, found no evidence that Invernon supervised any of Bay Construction's work. Invernon was paid $1,000 by Bradshaw's law firm in November 2014 and another $5,000 from Bay Construction's checking account in December 2014. On December 22, 2014, Bay Construction obtained a contractor's license with Gonzalez listed as the President, Secretary, Treasurer, and Owner.

In October 2014, Bradshaw enlisted his personal banker to set up a business checking account for Bay Construction. Bradshaw used his own Social Security number and deposited $10,000 from his law firm's checking account to Bay Construction's new checking account. Bradshaw was and remained the sole authorized signatory on Bay Construction's checking account until the company ceased operation. He designated himself President of Bay Construction and used his law firm office as the business address; neither Gonzalez's name nor anyone else's appears on the banking documents. At Bradshaw's request, Bradshaw's wife opened two American Express cards under her name on behalf of Bay Construction. The first card, opened in July 2014, was issued to Bradshaw, his wife, and Grey. The second, opened in January 2015, was issued to Bradshaw, his wife, and Brea Violette, the receptionist at Bradshaw's law firm. The statements for both cards were sent to Bradshaw's law firm office for his review and payment authorization.

On February 3, 2015, Bradshaw filed the Gosey Trust's "First and Final Report and Account of Trustee," covering the period from December 2, 2013 through November 30, 2014. In this report, Bradshaw said there was "no relationship or affiliation between [him] and any agent hired by [him]" during the accounting period. Bradshaw again requested that the probate court terminate its supervision over the Gosey Trust; the probate court declined to do so. Bradshaw appealed the probate court's denial order, and the Court of Appeal reversed, terminating the probate court's supervision over the Trust on July 29, 2016.

Bradshaw had another client, Noretha Jones, who, like Gosey, was an elderly woman seeking Bradshaw's assistance in

a landlord-tenant dispute. Bradshaw referred Jones to Bay Construction for repair work on her rental unit and, in a May 2015 letter, disclosed to Jones his affiliation with the company as follows: "When I referred you to Bay Construction, Inc., I informed you that I was affiliated with Bay Construction, Inc., in that I am their attorney, I filed their articles of incorporation and am the initial agent for service of process, my staff provides back office support for them including phone support, and that we share a receptionist. My son also works for them. Should a dispute arise between you and them, I would not be able to represent either side as it would constitute a conflict of interest." Jones's daughter-in-law Linda Lee testified that no one had mentioned Invernon to her and she had never met Invernon; that Grey and Bradshaw conducted the negotiation for the repair work on behalf of Bay Construction; and that she barely communicated with Gonzalez, who spoke little despite his presence at the negotiation.

After Gonzalez stopped working for Bay Construction in December 2015, Violette became the Chief Executive Officer, Chief Financial Officer, and Secretary on January 7, 2016, and Bradshaw seemingly took over those positions in March 2016. The updated documents filed with the Secretary of State were signed using Gonzalez's signature stamp. Bay Construction's license was suspended on January 14, 2016, and the company ceased operations that month. Through April 2016, Bradshaw and Grey charged $2,675.29 to one of Bay Construction's American Express cards for various personal purchases such as snowboarding expenses and the Presidio Social Club.

## C.

We next discuss Bradshaw's petitions for two reverse mortgages on Gosey's home and the repair work Bay Construction did on the home.

On February 14, 2014, ten days after Bradshaw and Gonzalez entered into the attorney-client agreement, Bradshaw petitioned the probate court for a reverse mortgage on Gosey's home. Bradshaw said a reverse mortgage was necessary because Gosey's expenses exceeded her income by $7,147 per month and the current cash balance of $76,825.81 in the estate would be exhausted by the end of November 2014. The probate court granted Bradshaw's petition, and a reverse mortgage of $346,000 was disbursed to Bradshaw, an amount he claimed would sustain Gosey's care for about four years.

Two and a half years later, in July 2016, Bradshaw filed a petition for a second reverse mortgage on Gosey's home, similarly stating that Gosey's monthly expenses exceeded her income by $7,644 per month and that the remaining balance from the first reverse mortgage would be exhausted in two or three months. He requested a lump sum disbursement of $889,741.05. Around this time, Gosey's condition worsened; Bradshaw's attorney, Robello, told the probate court that Gosey's doctors believed she would live only six more months. This petition prompted an investigation by the probate court, as discussed further below.

According to a declaration Bradshaw submitted to the probate court, Bay Construction performed the following repairs on Gosey's home: (1) In January 2015, Bradshaw authorized the Gosey Trust to pay Bay Construction $9,933.41 to repair the "emergency" flooding damages caused by a burst pipe underneath the property. (2) Bay Construction replaced the

staircase that Gosey used to access the backyard and garden for $48,909.20, which Bradshaw found to be "dangerous" with "significant rotting." (3) Bradshaw authorized payment of $70,793.36 to Bay Construction from May to August 2015 to repair the rear foundation of Gosey's home; according to Bradshaw, a pest control company had inspected the foundation and found it had shifted due to termite infestation. There is no credible evidence that Bradshaw obtained an assessment by a licensed contractor or competitive bids for any of this work.

For the staircase replacement, Bradshaw obtained a permit in June 2014. But no work was done until Bay Construction's proposal was submitted and accepted by Bradshaw on January 31, 2015, roughly a month after the CSLB issued the company a contractor's license. Bradshaw offered no reason for the seven-month delay even though, according to him, "it was clear that the steps were not safe" and repair was necessary because the staircase "was the only back entrance to the home" and served as Gosey's fire escape.

For the foundation repair, Bay Construction's proposal quoted $40,735.05, with a quarter of that amount to be paid upon acceptance of proposal, half upon delivery of materials, and the rest upon completion of the repair. Bradshaw immediately accepted the proposal and authorized the Trust to pay the full amount of $40,735.05 to Bay Construction on the same day. In addition to that payment, Bay Construction was paid another $6,350 the next day, $15,187.89 a week later, $5,853.27 on August 10, 2015, and $2,667.15 on August 26, 2015 — for a total of $70,793.36. Bradshaw explained to the probate court that "change orders were made to the project causing delays and increased costs" after an inspector found the initially approved plans did not comply with current codes.

Throughout this period, the Trust owed $45,000 in arrears to the Institute on Aging, the agency that provided daily care to Gosey.

## D.

The probate court learned of Bradshaw's possible affiliations with Bay Construction upon his petition for a second reverse mortgage and promptly appointed Nancy Rasch to represent Gosey. Rasch told the court that Bradshaw had not disclosed information "relevant to a determination about the reasonableness of the funds spent on repairs," principally "how Juan Gonzalez went from being an unlicensed handyman to a licensed contractor." She also said "[t]here appear[ed] to be a lack of clarity and disclosure" concerning the facts that Bradshaw did not obtain competitive bids for the work done on Gosey's home, that Bradshaw was Gonzalez's attorney, and that Bay Construction employed Bradshaw's son, Grey. The probate court issued a written inquiry on September 19, 2016, ordering Bradshaw to "explain how the funds were spent that resulted in such a quick depletion of available funds, including specific information about any and all repairs paid for with those funds."

Bradshaw filed two supplementary declarations in response. The first did not address his role in setting up Bay Construction or his attorney-client relationship with Gonzalez. He stated that he "called several contractors in an attempt to obtain bids . . . but most of the contractors did not return [his] call much less offer a bid" and Bay Construction emerged as the only choice for various emergency repairs. According to Bradshaw, "the lack of response or interest from the contractors [was] due to the availability of many larger construction projects in San Francisco at the time."

In a second declaration, he stated: "As noted in my previous declaration, for many of those jobs I did call different contractors for quotes, but I rarely had calls back, and when I did the contractors were not interested in the job or my conservative price point." In addition, Bradshaw characterized his affiliation with Gonzalez and Bay Construction as limited. He said that he allowed Gonzalez to utilize his law firm office and the assistance of his receptionist, and that he prepared and filed Bay Construction's incorporation documents at no cost to Gonzalez or Bay Construction because "Gonzalez struck [him] as a hard-working and skilled contractor who needed help getting a leg up." According to Bradshaw, Gonzalez "independently made" the decision to hire Grey, and Bradshaw otherwise "had no relationship" with Bay Construction or Gonzalez. Bradshaw said he "d[id] not have, and never ha[d] had a financial interest in Bay Construction; nor ha[d] [he] received any financial benefit from Bay Construction or its construction projects." In addition, his second declaration said Bay Construction had a valid license with Invernon serving as the RMO.

On September 27, 2016, the probate court held a hearing on Bradshaw's petition for a second reverse mortgage. The judge expressed concerns about the appropriateness of the Trust money spent, the relationship between Bradshaw and Bay Construction, and the manner in which Bay Construction was hired. The judge asked if Bradshaw was using his position as a fiduciary to further a career by giving unbid work to an individual or corporation with which he had ties, noting that "Bradshaw was doing lots of things to advance Bay Construction's interests." The probate court eventually authorized a second reverse mortgage on the Gosey home in

October 2016 on the condition that only $250,000 may be disbursed for the purpose of paying for Gosey's care and living expenses, with no other expenditures permitted without prior court approval. Bradshaw confirmed there were no more repairs necessary on the Gosey home, and Robello likewise confirmed that the approved disbursement was to be used solely for Gosey's care.

**E.**

Shortly after Gosey passed away in June 2017, counsel for Dolores Coleman (Coleman), one of the beneficiaries of the Gosey Trust, petitioned the probate court to suspend and remove Bradshaw as trustee. The probate court granted Coleman's petition and appointed an interim trustee on January 25, 2018. The superior court agreed and formally removed him as trustee, concluding that Bradshaw materially breached the Gosey Trust by violating his fiduciary duties. (*In re Gosey Revocable Trust Dated January 3, 2007*, (Super. Ct. City and County of S.F., 2019, No. PTR-17-301118) (*In re Gosey*), affd. *Coleman v. Bradshaw* (Sept. 30, 2022, A157968) [nonpub. opn.] (*Coleman*).) Specifically, the superior court found that Bradshaw engaged in self-dealing "when he repeatedly engaged Bay Construction, Inc., a company in which he was a principal and a substantial creditor, to perform no-bid work on settlor Ora Gosey's home"; that he did so "knowing that Bay Construction was without credible contracting credentials"; and that he demonstrated bad faith by "actively concealing from the court and misrepresenting his interests, Bay Construction's lack of credentials and the no-bid status of the work." The court said that while each circumstance in isolation would not necessarily lead to a finding of breach, the totality of circumstances showed Bradshaw "committed significant breaches" and provided "no

confidence that Bradshaw would act any differently" if reinstated as trustee.

During those proceedings, the parties stipulated that the work Bay Construction performed on Gosey's home was of professional quality and priced at fair market value, and on that basis, Bradshaw argued he could not have breached his duties to the Gosey Trust. The court rejected this argument, explaining that "[t]he harm in Bradshaw's actions is the jeopardy in which he put Gosey . . . and the whole Trust" by allowing an unqualified contractor to perform "substantial life safety work on . . . Gosey's only home." The Trust required Bradshaw to perform the duties of a trustee as a prudent person acting in good faith would; such a person, the court said, would not have undertaken the same risks and "certainly not without discussing the issues with interested parties."

As relevant here, the probate court credited Gonzalez's testimony over Bradshaw's. Likewise, the superior court found that Bradshaw repeatedly "lied about many of the facts discussed" and "misstated a number of material facts and omitted many others."

## F.

In October 2017, the OCTC charged Bradshaw with five counts of misconduct, alleging that Bradshaw (1) created and perpetuated a scheme to defraud the Trust, (2) breached his fiduciary duties as trustee, (3) misappropriated funds in the Trust to benefit Bay Construction, (4) made misrepresentations in various court documents, and (5) engaged in a contractor business without a license.

After a 22-day trial, the State Bar Hearing Department concluded that Bradshaw was culpable of engaging in a scheme to defraud the Gosey Trust (count one), breaching his fiduciary

duties (count two), and making several misrepresentations under penalty of perjury (count four). The hearing judge found Bradshaw not credible on several points, including the existence of an attorney-client relationship between Bradshaw and Gonzalez, Bradshaw's testimony regarding his limited control of Bay Construction, his purported receipt of no bids or estimates from other contractors, and his purported lack of motivation to conceal his true affiliation with Bay Construction. The Hearing Department recommended disbarment.

On July 30, 2019, soon after the superior court's decision in *In re Gosey*, the Review Department issued an opinion dismissing all counts with prejudice. The OCTC petitioned for review, and we remanded the matter to the Review Department for reconsideration in light of the *Coleman* decision. Meanwhile, Bradshaw appealed the judgment in *Coleman* and challenged the sufficiency of the evidence. In September 2022, the Court of Appeal affirmed the superior court's judgment finding a breach of trust, concluding all factual determinations were supported by substantial evidence.

On remand in this matter, the Review Department held that Bradshaw was culpable of three grossly negligent misrepresentations (count four) and recommended six months of actual suspension. In so concluding, the Review Department reiterated its prior rejection of various factual findings supporting a scheme to defraud (count one), rejected the factual findings of Bradshaw's bad faith and disregard of his fiduciary duties (count two), and affirmed the Hearing Department's dismissal of culpability for misappropriation (count three). Judge Ribas dissented; she would have found Bradshaw culpable on the first four counts alleged by the OCTC and would

have adopted the Hearing Department's recommendation of disbarment. We granted the OCTC's petition for review.

## II.

In attorney discipline proceedings, the burden is on the OCTC to prove culpability by clear and convincing evidence. (Rules Proc. of State Bar, rule 5.103.) The clear and convincing evidence standard "demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt. This intermediate standard 'requires a finding of high probability.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.)

In this matter, the Hearing Department found culpability on three counts while dismissing two others and recommended disbarment. Before the Review Department, Bradshaw argued that the evidence was insufficient to establish culpability by clear and convincing evidence. The Review Department agreed and dismissed all counts in a 2019 opinion. The OCTC appealed, and we remanded the matter to the Review Department to consider the superior court's then-recent decision in *In re Gosey* finding Bradshaw in breach of his fiduciary duties and removing him as trustee. After the Court of Appeal in *Coleman* upheld the superior court's decision in *In re Gosey*, the Review Department revisited this matter and found Bradshaw culpable for three instances of grossly negligent misrepresentation, recommended a six-month suspension and other remedial measures, and otherwise affirmed its 2019 dismissal of other charges.

In our consideration of this matter, "[t]he findings of the [H]earing [Department] . . . are entitled to great weight." (*Greenbaum v. State Bar* (1987) 43 Cal.3d 543, 549.) In

particular, "the hearing [court] is best suited to resolving credibility questions, because it alone is able to observe the witnesses' demeanor and evaluate their veracity firsthand." (*McKnight v. State Bar* (1991) 53 Cal.3d 1025, 1032; see *Connor v. State Bar* (1990) 50 Cal.3d 1047, 1055 (*Connor*) ["On matters of credibility, we are reluctant to reverse the decision of the hearing panel, which had the opportunity to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony."].) At the same time, "while we give great weight to both the review department's disciplinary recommendation and the hearing panel's factual findings, it is this court's duty to independently examine the record, examine the evidence and pass on its sufficiency. [Citations.] Independent review of the record is particularly appropriate when, as here, the review department and the hearing panel have disagreed, and the review department itself is divided." (*Connor*, at p. 1055.)

Further, this disciplinary proceeding has occurred alongside a parallel probate proceeding in civil court (the *In re Gosey/Coleman* litigation). Although civil court findings are typically made under a preponderance of the evidence standard and are not binding in this disciplinary matter, we accord such findings a strong presumption of validity if they are supported by substantial evidence and especially if the issues in civil court bear a strong similarity, if not identity, to the charged disciplinary conduct. (*Berstein v. Committee of Bar Examiners* (1968) 69 Cal.2d 90, 101–102; see *In the Matter of Kinney* (Review Dept. 2014) 5 Cal. State Bar Ct. Rptr. 112, 117.) Nevertheless, we must ultimately "assess [any findings] independently under the more stringent [clear and convincing]

standard of proof applicable to disciplinary proceedings." (*Maltaman v. State Bar* (1987) 43 Cal.3d 924, 947.)

## A.

We first consider whether the evidence establishes under count one that Bradshaw engaged in a scheme to defraud in violation of section 6106, which states that "[t]he commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise," may be cause for suspension or disbarment. As relevant here, Bradshaw may be found culpable of defrauding the Trust based on conduct reflecting common dishonesty — that is, dishonest conduct that does not necessarily give rise to criminal liability or cause monetary loss. (See *Trusty v. State Bar* (1940) 16 Cal.2d 550, 554 [gross negligence accompanied by an element of deceit sufficient to prove moral turpitude warranting disbarment]; *Crane v. State Bar* (1981) 30 Cal.3d 117, 124 [attempt to deceive escrow agents by deleting excerpts from a beneficiary statement without authorization]; *Farnham v. State Bar* (1988) 47 Cal.3d 429, 446 [habitual disregard of client's interests such as misrepresenting case statuses].) The fact that lack of honesty can give rise to culpability for a scheme to defraud under section 6106 is consistent with the statute's purpose of regulating professional misconduct, for acts of dishonesty "manifest an 'abiding disregard of " 'the fundamental rule of ethics . . . without which the [legal] profession is worse than valueless.' " ' " (*Levin v. State* (1989) 47 Cal.3d 1140, 1147; *Zitny v. State Bar* (1966) 64 Cal.2d 787, 792–793.)

Considering the totality of the circumstances, we find Bradshaw culpable of engaging in a scheme to defraud the Gosey Trust by clear and convincing evidence. Bradshaw fraudulently held himself out to be a prudent trustee who acted in good faith and in the Trust's best interest. By obtaining reverse mortgages, Bradshaw converted the equity of Gosey's home into cash within the Trust, which he had full access to and enjoyed wide discretion in spending. Bradshaw incorporated Bay Construction purportedly for the benefit of Gonzalez but retained complete control of the company's cashflow, finances, payroll, and operations behind the scenes. Bradshaw identified various "essential" repairs on Gosey's home, and by not obtaining competitive bids, he made sure Bay Construction would be awarded contracts for the repairs and paid in amounts far exceeding its initial proposals. By withholding disclosure of his financial ties with Bay Construction and its licensing arrangement from the probate court, Bradshaw interfered with the court's duty and ability to ensure Trust funds were prudently managed.

Bradshaw's attempts at self-enrichment through hiring and paying a company he effectively controlled, coupled with the failure to disclose the arrangement, created a heightened risk that Trust funds would not be spent in good faith or in the best interest of Gosey. Bradshaw exhibited "conduct on the part of a member of the bar which cannot be condoned," whether or not his action caused material damage to Gosey or the Trust. (*Lady v. State Bar* (1946) 28 Cal.2d 497, 504; see *Pickering v. State Bar* (1944) 24 Cal.2d 141, 145 [Business and Professions Code denounces "the endeavor to secure an advantage by means of falsity" without regard to whether anyone was actually deceived

or harmed]; *Allen v. State Bar* (1977) 20 Cal.3d 172, 178 [no harm requirement in finding fraudulent and deceitful acts].)

Our independent findings mirror the facts the hearing judge found to support culpability under count one. The OCTC argues the Review Department improperly disregarded five factual findings when it dismissed this count for want of clear and convincing evidence. Although the Review Department is required to independently review the record and may depart from the factual findings of the hearing judge, "[t]he findings of fact of the hearing judge are entitled to great weight." (Rules Proc. of State Bar, rule 5.155(A).) We find no basis in the record to reject the hearing judge's findings and therefore adopt those findings: (1) Bradshaw misrepresented his true affiliation with Bay Construction; (2) he repeatedly hired and paid Bay Construction, an unlicensed contractor, for services that required a licensed contractor; (3) he concealed from the probate court the intended purposes of the reverse mortgages; (4) he attempted to avoid court supervision in order to perpetuate the alleged fraud; and (5) he maintained effective control of Bay Construction and ran the company from the shadows. We discuss each finding below.

First, the Review Department did not agree with the hearing judge that Bradshaw misrepresented his true affiliation with Bay Construction as part of the alleged scheme to defraud the Trust. According to the Review Department, the OCTC did not prove by clear and convincing evidence that Bradshaw was the owner or had control of the company. The Review Department found Gonzalez's testimony on this issue "inconsistent" and concluded that "all of the documents in the record indicate[d] Gonzalez's ownership of Bay Construction." It further reasoned that even if the evidence established Bradshaw

19

had ownership or control, this was permitted by the Trust instrument. Relatedly, the fifth factual finding set aside by the Review Department was that Bradshaw ran Bay Construction from the shadows. It concluded that Bradshaw did not control or own Bay Construction despite incorporating the company and providing initial funding.

As an initial matter, the OCTC need not conclusively prove Bradshaw's ownership or actual control to establish he "ma[de] multiple misrepresentations under penalty of perjury in court documents regarding his true financial affiliation with Bay Construction," as the Hearing Department found. Bradshaw's culpability for misrepresentation arose from the discrepancy between his declarations of *no* financial relationship with the company and what ample evidence in the record shows: Bradshaw "incorporated, funded, and controlled the finances" and directed the company's operations. By Bradshaw's own admission, his role in initially incorporating and representing Bay Construction and allowing the company to utilize various resources that belonged to his law firm was sufficient to "constitute a conflict of interest" disqualifying Bradshaw from representing his other client, Noretha Jones, in any legal dispute with Bay Construction.

Bradshaw's control of the company is further evidenced by Gonzalez's lack of awareness and participation in various activities that one would reasonably attribute to a business owner. Gonzalez, whom the Review Department accepted as the true owner of Bay Construction, was an hourly employee whose wages were determined and paid by Bradshaw. Gonzalez neither "controlled the payroll" for the company nor made any decisions on which jobs to accept and how much to charge; those decisions were made by Bradshaw. Gonzalez never approved

any proposals to be submitted to Gosey, nor did he authorize issuance of invoices for work done.  Gonzalez was unaware that Bradshaw had opened a business checking account for Bay Construction and that payments were being made on the American Express cards for the company.  Because Bradshaw was the sole authorized signatory on Bay Construction's only checking account, and because the credit card statements were sent to Bradshaw for review and payment, Gonzalez had no knowledge or control of Bay Construction's cashflow or finances.

Contrary to the Review Department's reasoning, Gonzalez's testimony on Bradshaw's control over Bay Construction did not stand alone.  The receptionist at Bradshaw's law firm, Brea Violette, testified that Bradshaw was the one "giving [] directions" to Gonzalez.  Jones's daughter-in-law, Linda Lee, testified that in negotiations with Bay Construction, Grey and Bradshaw dominated the conversation while Gonzalez spoke so little that she presumed he did not "sp[eak] English very well."  When Lee pushed back on Bay Construction's initial bid, Bradshaw interjected with a counteroffer without discussing it with Gonzalez first.

To the extent that the issue of ownership and control hinges on the credibility of Gonzalez versus Bradshaw, we see no basis for rejecting the hearing judge's credibility determination.  The Review Department pointed out that Gonzalez offered inconsistent answers "at least twice," that Gonzalez's signature was on the corporate documents as the sole shareholder, and that the hearing judge did not specify the "numerous credible exhibits" she relied upon.  But the Review Department did not make clear what inconsistencies in Gonzalez's testimony it was referring to.  And it is not the case that "all the documents in the record indicate Gonzalez's

ownership of Bay Construction"; the banking records, which showed Bradshaw's full control over the company's cashflow, provide strong reason to doubt Gonzalez was the true owner. Further, the Hearing Department described Lee's observations of the power dynamic between Bradshaw and Gonzalez, the executive roles of Violette and Bradshaw at Bay Construction after Gonzalez's departure, and the control and use of company credit cards by Bradshaw, his wife, and Grey. This evidence corroborated the Hearing Department's direct observations of Bradshaw's and Gonzalez's credibility during testimony, as well as the superior court's similar credibility determination in *In re Gosey*.

Accordingly, we find that the Review Department erred in rejecting the findings that Bradshaw misrepresented his affiliation with Bay Construction and that he effectively controlled the company.

The second finding set aside by the Review Department was that Bradshaw hired and paid an unlicensed contractor for services that required a licensed contractor. According to the Review Department, although the validity of Bay Construction's license was suspect, the company was nevertheless licensed and held valid permits for all repairs on Gosey's home. But Bay Construction was issued a license on the condition that a licensed contractor, Invernon, would serve as an RMO and directly supervise Bay Construction's work. There is no indication in the record that Invernon actually performed that function. Neither Grey nor Gonzalez, the only two payroll employees of the company, had ever met or spoken to Invernon. Grey testified that no one had ever mentioned Invernon to him. Lee and Gosey's tenant, Claire Lewis, said essentially the same thing. Bradshaw knew the statutory requirements of an RMO,

and since he was the only person in contact with Invernon, he knew that Invernon did not supervise any work. We see no basis for rejecting the finding that Bradshaw hired and paid an unlicensed contractor as part of his scheme to defraud the Trust.

The other findings dismissed by the Review Department are that Bradshaw concealed from the probate court the intended purposes of the reverse mortgages and that he attempted to avoid court supervision in order to perpetuate the alleged fraud. As discussed under count four below (*post*, at pp. 24–26), the record leaves us unable to discern any good-faith reason for Bradshaw's lack of transparency to the probate court. No valid reason appears for rejecting these findings.

In sum, clear and convincing evidence establishes that Bradshaw attempted to enrich himself by repeatedly hiring and paying an unlicensed contracting company he controlled, without adequate disclosure of his financial ties to the company or its licensing status, all while holding himself out to Gosey and the probate court as a fiduciary acting in the Trust's best interest. We conclude that Bradshaw is culpable for engaging in a scheme to defraud the Trust in violation of section 6106.

### B.

We next consider whether the evidence supports the hearing judge's finding that Bradshaw breached his fiduciary duty to Gosey and her beneficiaries in count two. We find that clear and convincing evidence shows Bradshaw breached his fiduciary duties in violation of section 6068, subdivision (a).

Trustees owe trust beneficiaries a duty of loyalty, and trustees are required to avoid self-dealing. (Prob. Code, §§ 16002; 16004.) The Trust instrument here permitted a trustee to "[e]mploy the Trustee, a relative of the Trustee, or a

business in which the Trustee has an interest, to perform needed services for the Trust . . . and pay compensation not exceeding fair market value" so long as the trustee "does not act in bad faith or in disregard of the purposes of the Trust."  At the same time, the Trust instrument says the trustee "has the duties imposed by law" and must exercise the power of trustee as "a prudent person would."

The Hearing Department found culpability on count two based on Bradshaw's repeated engagement of a company he owned to perform work on Gosey's home while knowing the company had no valid license, concealing his affiliation with the company, and failing to obtain competitive bids.  These findings are echoed by the superior court decision in *In re Gosey*, which found that Bradshaw "jeopardized the safety of the [Gosey] home and the health and welfare of its occupants" in disregard of the Trust's principal purpose to care for Gosey, and that his failure to disclose his ties with Bay Construction to the court demonstrated bad faith.  The Court of Appeal affirmed the superior court's finding that Bradshaw breached his fiduciary duties.

The Review Department, by contrast, concluded that Bradshaw did not act in disregard of the Trust's purposes because the repair work had valid permits and approvals from the San Francisco Department of Building Inspection (DBI) and thus "Gosey and the occupants were never actually in jeopardy." It further reasoned that Bradshaw did not act in bad faith because he had no duty to disclose his relationship with Bay Construction to the probate court under the Trust instrument or the Probate Code.

In finding no culpability for breach of fiduciary duty, the Review Department emphasized that Gosey was not harmed

because there is no evidence that the repair work was not done competently at fair market value. But culpability on this count does not turn on actual harm to the client, monetary or otherwise. We have consistently rejected a harm requirement in evaluating culpability for attorney misconduct; instead, we have evaluated the degree of harm as an aggravating factor in the discipline phase. (See *Connor*, *supra*, 50 Cal.3d at p. 1057 [actual injury to client is not an element of breaching the duty against self-dealing]; *Allen v. State Bar* (1977) 20 Cal.3d 12, 17 [no harm requirement in finding fraudulent and deceitful acts]; *Barreiro v. State Bar* (1970) 2 Cal.3d 912, 926 [same for willful misrepresentations]; Rules Proc. of State Bar, std. 1.5(j) [listing "significant harm to the client" as an aggravating factor].)

The superior court found that "Bradshaw breached the Trust when he repeatedly engaged Bay Construction, Inc., a company in which he was a principal and a substantial creditor, to perform no-bid work on settlor Ora Gosey's home, which was the Trust's main asset, knowing that Bay Construction was without credible contracting credentials, all while actively concealing from the court and misrepresenting his interests, Bay Construction's lack of credentials and the no-bid status of the work." This finding was affirmed by the Court of Appeal, and we conclude it is supported by clear and convincing evidence.

As Judge Ribas explained in dissenting from the Review Department's analysis, Bradshaw "plac[ed] the interests of Bay Construction over the primary purpose of the Gosey Trust, which was the care and maintenance of Gosey," as evidenced by his disbursement of "punctual payments to Bay Construction" even as the Trust owed $45,000 in arrears to Gosey's caregiver, the Institute on Aging. Moreover, we agree with Judge Ribas

that the fact "that DBI later validated the work as competent did not obviate the risk Bradshaw imposed on the Gosey Trust by employing an unlicensed contractor — who had not demonstrated the requisite training and knowledge of a licensed contractor — to work on the Gosey House at the outset. [Citations.] In other words, whether Bradshaw breached his fiduciary duty does not turn on what DBI decides to do after the fact. The employment of an unlicensed contractor is inconsistent with the prudent person standard and does not show due regard for the trust."

The fact that the contractor Bradshaw employed was a company he controlled and had a financial interest in only strengthens the case for finding breach. It is true that the Trust permitted self-dealing, but that permission did not obviate the duty to act in good faith and as a prudent person would. Upon determining that the back staircase of Gosey's home was "dangerous" and obtaining a permit for repair in June 2014, Bradshaw did nothing for seven months — even though the staircase was Gosey's only fire escape — until Bay Construction submitted a proposal and was given the job without other bids. Even accepting that Bay Construction's repairs on Gosey's home were done competently at fair market value, we do not agree that a trustee, acting as a prudent person in this context, would award over $150,000 of work to a company he controlled without obtaining competitive bids. In addition, the Trust instrument did not exempt Bradshaw from the duty to disclose his financial ties with Bay Construction under rules 1.7 and 1.8.1 of the Rules of Professional Conduct. (See *Schneider v. State Bar* (1987) 43 Cal.3d 784, 796.)

In sum, the ends do not justify the means when it comes to a trustee's faithful discharge of fiduciary duties. Clear and

convincing evidence shows Bradshaw breached the Trust by prioritizing his interests over Gosey's and by exposing Gosey to the risks of engaging a contractor that lacked genuine credentials and qualified supervision.

## C.

Although the OCTC requests that this court find Bradshaw culpable for misappropriating $157,246.76 from the Trust in violation of section 6106 (count three), we decline to rule on this count. The record does not clearly establish the fair market value of the repair work performed on the Gosey home, nor does it provide a way to ascertain such value in the absence of competitive bids and evidence showing the home's condition before and after the repairs. Moreover, as we explain further below, Bradshaw's disbarment is warranted even without culpability on this count.

## D.

As to the allegations of misrepresentation under count four, the Hearing Department found that Bradshaw intentionally and willfully made three misrepresentations to the probate court in violation of section 6106: (1) Bradshaw stated Gosey was removed from her home by APS while petitioning the probate court to appoint him as temporary and permanent conservator in August 2013; (2) Bradshaw stated in the February 2015 accounting report to the probate court that he shared "no relationship or affiliation" with any agent hired by him between December 2, 2013, and November 30, 2014; and (3) Bradshaw stated in his second supplemental declaration to the probate court that he had no financial interest in Bay Construction. The Review Department rejected the finding as to the first statement, and the OCTC does not appeal that ruling

here. The Review Department found Bradshaw culpable with regard to the other two statements, along with another sworn declaration in the *In re Gosey* litigation, dated September 20, 2017, that repeated Bradshaw's assertion of no financial interest in Bay Construction.

In so concluding, the Review Department relied on findings by the superior court in *In re Gosey*: "The crux is that the superior court found that Bradshaw should have disclosed more facts regarding his relationship to Bay Construction. It was imprudent for Bradshaw to present information to the court in the way that he did. Based on the superior court's finding, we now find that Bradshaw violated section 6106 when he stated in the second supplemental declaration that he did not have a financial interest in Bay Construction." But the Review Department said it could not find by clear and convincing evidence that Bradshaw intended to mislead the court and instead concluded that "Bradshaw's actions amount to gross negligence under section 6106."

We have no difficulty concluding that clear and convincing evidence shows Bradshaw intentionally misrepresented his relationship with Bay Construction and Gonzalez in all three instances. Given the abundant evidence of Bradshaw's controlling role in the company, or even on the view that he was merely an unsecured creditor of Bay Construction, his statements that he had no financial interest in the company were plainly false. And a strong inference of intentionality arises from the fact that he stood to benefit from mispresenting that the company and the Trust were engaged in arms-length transactions, as well as from the fact that he repeated the misrepresentations. (See *Lee v. State Bar* (1970) 2 Cal.3d 927, 942 ["repeated false statements and attempts to deceive the

28

court" are evidence of "corrupt and dishonest purposes"].) This conclusion is additionally bolstered by the superior court's findings that Bradshaw lied when he testified that he had no financial interest in Bay Construction and that Gonzalez ran the company, prepared the company's bids, and made the decision to hire Bradshaw's son.

Further, we find it significant that Bradshaw failed to disclose the true nature of his relationship with Bay Construction when the probate court was investigating his possible misconduct as trustee and attempting to account for Trust assets that had been rapidly depleted. In particular, the probate court sought to ascertain Bradshaw's connections to Bay Construction through written declarations after Rasch had informed the court that such affiliations existed and Bradshaw displayed a lack of candor and transparency throughout her investigation. When viewed in that light, any contention that Bradshaw was only grossly negligent — because he made his representations with the advice of his lawyer or because he genuinely believed he did not have to report any interest in Bay Construction short of formal ownership — is unpersuasive.

Bradshaw also displayed a lack of candor when he declared that he had "no relationship or affiliation" with any agent he hired between December 2, 2013, and November 30, 2014. Although he did not hire Bay Construction during that period, he did repeatedly hire NJ Construction, the handyman company owned by Gonzalez. Bradshaw and Gonzalez began the process of creating and incorporating Bay Construction in February 2014. In light of the close business relationship between Bradshaw and Gonzalez during this period, Bradshaw's declaration that he had "no relationship or

affiliation" with NJ Construction (and by extension Gonzalez) was clearly false.

We find that Bradshaw willfully misrepresented his relationship with Bay Construction and Gonzalez under count four.

## III.

Having found Bradshaw culpable for engaging in a scheme to defraud, breaching his fiduciary duty, and making intentional misrepresentations in violation of sections 6106 and 6068, we now turn to the appropriate discipline for his misconduct.

State Bar disciplinary proceedings are meant to protect the public, the courts, and the legal profession. (*Chasteen v. State Bar* (1985) 40 Cal.3d 586, 591 (*Chasteen*).) "[T]he discipline in each case must be determined on the particular facts of the case." (*Ibid.*) Exercising our independent judgment, we consider the totality of the circumstances with " 'no fixed formula.' " (*Connor, supra,* 50 Cal.3d at p. 1055.) We consider the State Bar Standards for Attorney Sanctions for Professional Misconduct (Jan. 2025) (Standards), applicable case law, and aggravating and mitigating factors proven by clear and convincing evidence. Although "we generally accord great weight to the Review Department's recommendation," " 'we have not hesitated to impose a harsher sanction than recommended by the department.' " (*In re Silverton* (2005) 36 Cal.4th 81, 89–90; see *In re Nevill* (1985) 39 Cal.3d 729, 735 [rejecting recommendation of suspension and ordering disbarment].)

Here, the Review Department's disciplinary recommendation was based on its finding of three instances of grossly negligent misrepresentation. We have found Bradshaw

culpable for more severe and extensive misconduct, and thus we consider the appropriate discipline accordingly.

## A.

We begin by considering aggravating factors. The OCTC bears the burden of proving each aggravating factor by clear and convincing evidence. (Standards, *supra*, std. 1.5.) In addition to factors inherent to the misconduct already established (*id.*, stds. 1.5(d) ["intentional misconduct, bad faith or dishonesty"], 1.5(e) ["misrepresentation"], 1.5(f) ["concealment"]), we consider several additional factors.

The first is prior discipline. (Standards, *supra*, std. 1.5(a).) In 2009, Bradshaw stipulated to misconduct in violation of section 6068, subdivision (m) for failing to inform his client Kita Miller of the amount of a settlement he received on her behalf. Specifically, he received a check of $47,500 made out to her but mailed her a check for $11,181.22 without informing her of the actual amount received. Bradshaw was subject to a private reproval. The Review Department reduced the weight assigned by the Hearing Department to this factor from moderate to minimal. But the prior disciplinary action occurred within six years of the events resulting in the current matter (see *In the Matter of Koehler* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 615, 628 [prior reproval occurring seven years prior was "not too remote"]), and we find it troubling that Bradshaw displayed a similar lack of honesty and loyalty in handling client funds (see *In the Matter of Shalant* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 829, 841 [greater weight placed on common element among attorney's prior and current misconduct]). Under the circumstances, we assign moderate weight to this factor.

Second, we consider the number of instances of misconduct. (Standards, *supra*, std. 1.5(b).) We have found Bradshaw culpable for three counts of misconduct, with each count encompassing multiple acts over a sustained course of action. Accordingly, we assign moderate weight to this factor. (See *In the Matter of Martin* (Review Dept. 2020) 5 Cal. State Bar Ct. Rptr. 753, 761 [moderate weight for two counts of misconduct involving multiple acts].)

Third, we assign substantial weight to the misconduct involving a highly vulnerable victim. (Standards, *supra*, std. 1.5(n).) Bradshaw's actions defrauding and draining a trust meant to benefit an elderly woman with advanced dementia were highly reprehensible. Gosey had no spouse or children; when she sustained a fall in 2013, it took days for her to receive medical attention because no one knew until her tenant checked in with her. Gosey's age, mental condition, and lack of community made her especially vulnerable. As Gosey's attorney and trustee of the Gosey Trust, Bradshaw was responsible for acting in her best interest, yet he repeatedly prioritized his own pecuniary interests over her welfare. Bradshaw paid Bay Construction liberally from the Trust even as bills from Gosey's caregiver were in arrears. Bradshaw knew Gosey had mere months remaining in hospice when he petitioned the probate court for a second reverse mortgage on her home, requesting a lump sum of $889,741.05. Bradshaw took advantage of Gosey's high level of vulnerability, and this factor must be accorded substantial weight, consistent with the public protection purpose of State Bar disciplinary proceedings.

Finally, we consider Bradshaw's "indifference toward rectification or atonement for the consequences of the misconduct." (Standards, *supra*, std. 1.5(k).) The Hearing

Department accorded significant weight to this factor, citing Bradshaw's record of avoiding accountability, lack of insight or remorse, and general indifference toward rectification. The Court of Appeal in *Coleman*, in affirming the removal of Bradshaw as trustee, similarly stated that "the trial made plain that Bradshaw sees nothing wrong in his actions." (*Coleman, supra*, A157968.) And as Judge Ribas observed in dissenting from the Review Department's recommendation, the record shows that Bradshaw has a history of "asserting nefarious motives on the part of those who questioned his dubious actions." During a September 2016 hearing in the probate court, Bradshaw accused the court of attempting to "demonize" him when the judge expressed valid concerns over Bradshaw's ties with Bay Construction and his lack of candor around his involvement. In addition, Rasch testified that Bradshaw wrote her a letter accusing her of defamation after she made a complaint to the State Bar based on her investigation. Throughout this disciplinary action, Bradshaw repeatedly deflected responsibility toward his lawyer Robello and has yet to acknowledge his wrongdoing. Because Bradshaw "has no appreciation that [his] method of practicing law is totally at odds with the professional standards of this state" (*Lebbos v. State Bar* (1991) 53 Cal.3d 37, 45), we accord substantial weight to this factor.

## B.

As for mitigation, "[a] lawyer must establish mitigating circumstances by clear and convincing evidence." (Standards, *supra*, std. 1.6.) We conclude that the record does not show Bradshaw's discipline should be mitigated for "extraordinary good character attested to by a wide range of references in the legal and general communities, who are aware of the full extent

of the misconduct." (*Id.*, std. 1.6(f).) Seven witnesses, comprised of friends, colleagues, and former clients, testified on Bradshaw's behalf at the Hearing Department. They described his generosity and loyalty as a friend, and some said they believed he was honest. Only three witnesses knew of Bradshaw's prior private reproval. When asked, five witnesses said their opinion of Bradshaw's character would be adversely affected if he were found culpable of some or all of the charges. Three said that culpability for making misrepresentations — the one count for which every adjudicatory body has found multiple instances of misconduct by Bradshaw — would lower their opinion of his character. Ernest Goldstein, a retired superior court judge who knew Bradshaw professionally, testified that his "reaction would be very negative" if the "allegations of self-dealing" or culpability under section 6068, subdivision (a) were found true. In light of his own witnesses' testimony, Bradshaw has not shown extraordinary good character attested to by references "who are aware of the full extent of the misconduct." (Standards, std. 1.6(f).)

Bradshaw's lack of integrity, determined by two separate factfinders, was further highlighted by the testimony of OCTC's rebuttal character witness, Richard Zitrin, an expert on legal ethics who also testified as a complaining witness at Bradshaw's first disciplinary action. In this matter, Zitrin testified that for six years in a row, Bradshaw failed to disclose his criminal record, including a felony conviction for grand larceny by check in 1991, when applying to a lawyer referral service run by a local bar association. When Zitrin investigated Bradshaw's representation of Kita Miller through the referral service — the investigation that resulted in a private reproval against Bradshaw — Bradshaw misled Zitrin into believing that his fee

agreement with Miller allowed him to deposit the settlement check made out to her into his own trustee account.

The Hearing Department assigned moderate weight to Bradshaw's character evidence and to the cooperation he showed by stipulating to certain facts and the authenticity of some exhibits (Standards, *supra*, std. 1.6(e)), and the Review Department agreed with those determinations. Although we do not question the hearing judge's assessment of Bradshaw's cooperation, in our judgment Bradshaw's character evidence, considered alongside the OCTC's rebuttal evidence, merits little weight in mitigation.

## C.

The record before us established multiple counts of misconduct in Bradshaw's handling of the assets and home of a highly vulnerable elderly victim to whom he owed a fiduciary duty. He misused his authority and Gosey's confidence in an attempt to enrich himself and made willful misrepresentations to various courts in order to obscure his relationship with Bay Construction and frustrate the probate court's ability to supervise his conduct as trustee of the Gosey Trust. The risks to the public, the courts, and the profession are compounded by the fact that Bradshaw had been disciplined for dishonesty in handling client funds not long before the present scheme and by Bradshaw's continuing indifference and lack of insight or remorse toward his misconduct.

Because the totality of the circumstances shows that Bradshaw has repeatedly failed to uphold the most basic duties of an attorney, we are compelled to find him unfit to serve as a member of the bar or an officer of the court. Regrettably, Bradshaw has shown himself unable to honor the duties of

honesty and loyalty inherent in the role of attorney and fiduciary, and we find no indication in the record of his capacity or willingness to reform. Because " ' "[o]ur principal concern is always the protection of the public, the preservation of confidence in the legal profession, and the maintenance of the highest possible professional standard for attorneys" ' " (*Chasteen, supra,* 40 Cal.3d at p. 592), we order Bradshaw disbarred. (See *Lebbos v. State Bar, supra,* 53 Cal.3d at pp. 43–44 [disbarment in first disciplinary action for attorney who lacked remorse despite committing multiple acts of dishonesty]; *Weber v. State Bar* (1988) 47 Cal.3d 492 [attorney disbarred for misconduct involving moral turpitude and dishonesty in handling client and trust funds].)

## CONCLUSION

We order that respondent Drexel Andrew Bradshaw, State Bar Number 209584, be disbarred from the practice of law in California and his name be stricken from the roll of attorneys.

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Bradshaw

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding** XX
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S282314
**Date Filed:** July 3, 2025

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Drexel Bradshaw, in pro. per., for Petitioner.

Ellin Davtyan, Brady R. Dewar, Rachel S. Grunberg and Danielle A. Lee for Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Drexel Bradshaw
3053 Fillmore Street, #205
San Francisco, CA 94123
(415) 275-1983

Danielle A. Lee
State Bar of California
180 Howard Street
San Francisco, CA 94105
(415) 538-2218